# Illinois Official Reports

## Appellate Court

---

### *People v. Vega*, 2018 IL App (1st) 160619

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRANDON VEGA, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-0619 |
| Filed | December 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-2252; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Gilbert C. Lenz, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, Annette Collins, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Hoffman and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, the defendant, Brandon Vega, was found guilty of two counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West 2012)) and received consecutive sentences of 35 and 26 years' imprisonment, for a total sentence of 61 years' imprisonment. Defendant's sentences included a 25-year minimum enhancement because he personally discharged a firearm which proximately caused great bodily harm to one victim (*id.* § 8-4(c)(1)(D)), and a 20-year enhancement for personally discharging a firearm (*id.* § 8-4(c)(1)(C)) with respect to the other victim. On appeal, the defendant argues that the evidence was insufficient to sustain his convictions for attempted first degree murder, that the trial court abused its discretion in sentencing him to 61 years' imprisonment, and that his sentence is unconstitutional. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3    The defendant was charged with, *inter alia*, six counts of attempted first degree murder stemming from the October 26, 2013, shooting of Xazavier Little (Xazavier) and Edward Little (Edward). The defendant was 18 years old at the time of the shooting. At trial, the following evidence was presented.[1]

¶ 4    Xazavier testified that, prior to October 2013, when he was 16 years old, he was a member of the Maniac Latin Disciples street gang. He knew several other people in the gang, including the defendant, with whom he attended grammar school. Xazavier explained that, in order to join the gang a person must be "violated in," which encompasses being beaten by fellow gang members for two minutes without fighting back. He was a member of the gang for two years before he decided to "quit" by not associating with the gang members anymore. Ordinarily, when a person leaves the gang, that person has to be "violated out," which entails a "more violent" beating by gang members for six minutes. Xazavier was not "violated out" of the gang.

¶ 5    In October 2013, Xazavier was living in a two-flat apartment building in the 2100 block of North Mulligan Avenue with his family, including his uncle Edward. Edward's bedroom was located on the first floor, in the back of the house, overlooking the patio. Xazavier lived on the second floor. There was a motion-activated light over the patio and garage.

¶ 6    On October 26, 2013, Xazavier was no longer in the gang and was at his cousin's house smoking marijuana. He left his cousin's house around 3 a.m. and walked home through the alley behind his house. As Xazavier approached his house, he saw the defendant and two other people drinking and talking near a blue van parked two garages down from his garage. Xazavier became nervous and walked closer to the garages in order to avoid being seen.

¶ 7    Xazavier entered his backyard, walked through the yard, and began climbing the back steps when he heard the defendant yell, "Zaza, come here." Xazavier continued to climb the stairs and observed the defendant walk into the backyard with codefendant Jacqueline

---

[1]The defendant proceeded to a jury trial, while his codefendant, Jacqueline Mendoza, proceeded to a simultaneous, but severed, bench trial. Our recitation of the facts is limited to only those presented as a part of the defendant's jury trial.

Mendoza. As Xazavier was at his back door, the defendant began climbing the stairs behind Xazavier and told him to "come outside and handle [your] business like a man." Xazavier believed this meant to "come take a violation." He responded, "I am not on none of that."

¶ 8    The defendant was on the staircase when he pulled a handgun from his waistband. He then pointed the gun at Xazavier's uncle, Edward, who had awakened and was looking outside through a window. The defendant stated, "I will shoot your uncle in the head right now." The defendant then began to shoot, hitting Xazavier in his hand and abdomen.

¶ 9    Xazavier ran inside and told his mother that he had been shot. He then ran downstairs and saw Edward coming out of his bedroom holding his leg, which had a "hole" in it and was bleeding. Police eventually arrived, and Xazavier told them he had been shot by the defendant. Xazavier was taken to the hospital where surgery was performed because of internal bleeding. He later learned that a bullet pierced his lung and exited his back, and that there were bullet fragments left in his right hand. Xazavier remained hospitalized for about a week.

¶ 10    Later on the same day as the shooting, following surgery, Detectives Tekaki and Jensen met with Xazavier in his hospital room. Xazavier told them that he had been shot by the defendant and identified the defendant in a photo array. On January 1, 2014, Xazavier went to the police station and identified the defendant from a lineup. Xazavier was "[100%]" certain that the defendant was the person who shot him when he spoke with responding officers right after the shooting, when he picked the defendant out of a photo array, when he picked the defendant out of a lineup, and when he identified the defendant in court.

¶ 11    Xazavier testified that he knew brothers Michael and Matthew Berrones, having grown up with them. They were also members of the same gang as the defendant and Xazavier. Xazavier testified that Michael Berrones does not look like the defendant and that he would never confuse the two.

¶ 12    On cross-examination, Xazavier admitted that, on January 1, 2014, he told police that he did not know the people who were standing by the van in the alley on October 26, 2013. Xazavier further testified that he did not recall whether he told the detectives at the hospital that the defendant fired at his uncle before firing at him but admitted he "may have." Xazavier testified that he is not currently in a gang but admitted to posting pictures on his Facebook page after the shooting "throwing up" hand gang signs.

¶ 13    On redirect examination, Xazavier testified that, following his surgery, he told detectives at the hospital that the defendant was among the individuals standing by the van in the alley. Xazavier also explained that he was not in a gang but wanted to be in one. Because of this, he posted pictures of himself flashing gang signs, which was considered "false reporting," making him a "poser."

¶ 14    Edward testified that, on October 26, 2013, he was living at the same address on Mulligan Avenue as Xazavier. Around 3 a.m., Edward was asleep in the back bedroom when he heard both a male and female voice say, "come take your punishment, Jay-Jay, come take your punishment like a man." He looked out the window, which overlooked the back porch, and saw Xazavier standing in the doorway and a man on the porch holding a gun. Edward saw the left side of the man's face. The man, who he identified in court as the defendant, was illuminated by a motion-detecting light. There was also a woman walking around the yard, telling Xazavier to come take his punishment. Edward had not seen either the defendant or the woman prior to that day.

¶ 15    When Edward saw the defendant point the gun at Xazavier, he froze. The defendant then pointed the gun at Edward and said, "I'll kill your family." Edward next saw Xazavier begin to go up the stairs and the defendant shoot the gun toward Xazavier five times, hitting him as he entered the doorway.

¶ 16    Edward jumped to the floor and began crawling out of the bedroom. He heard five more shots and felt pain in his right calf. Edward realized that he had been shot and that he was bleeding. He took a towel and wrapped it around his leg. The police were called, and an ambulance took him to the hospital.

¶ 17    Edward was "in pain" and his "mind wasn't right or nothing because of what [he] had been through." At the hospital, he met with detectives, but was not able to identify the defendant in a photo array. When Edward went to the police station on January 1, 2014, he identified the defendant in a lineup as the individual who had shot him.

¶ 18    On cross-examination, Edward testified that he wears glasses for distance and reading and that he did not have them on when the shooting occurred. He explained that he did not need them because he could see "practically well without them." Edward denied telling Officer Angela Perez at the house that he was asleep when he awoke to gunshots and a "burning sensation." He explained that if a police officer wrote that down, "[s]omebody took a wrong report." Edward did not have a chance to talk to Xazavier about the shooting prior to speaking with the detectives at the hospital.

¶ 19    Chicago police officer Perez testified that, on October 26, 2013, she arrived at the apartment building on Mulligan Avenue shortly after the shooting. She observed Xazavier lying in blood in the hallway. Prior to his ambulance transport, Xazavier told her that he was shot by the defendant. Officer Perez also observed Edward with a gunshot wound to his right leg, lying a few feet from Xazavier. Edward told her that he was asleep in bed, heard gunshots, and felt a burning sensation before realizing he had been shot. Edward did not tell Officer Perez that he saw the shooter or looked out of the window.

¶ 20    Chicago police Detective Tekaki testified that he arrived at the residence on Mulligan Avenue around 3:30 a.m. and proceeded to the backyard. He observed shell casings from a .40-caliber firearm around the deck area and bullet holes in a window and around the window frame. He further saw bullet holes in the door of the rear entrance. Detective Tekaki went into Edward's room and saw bullet holes in the blanket covering the window and on the walls, door, and dresser.

¶ 21    Later in the day, Detective Tekaki went to the hospital and showed Xazavier a photo array. Xazavier identified the defendant, without hesitation, as the individual who shot him.

¶ 22    The parties stipulated that Dr. Anthony Beldea would testify that he treated Xazavier for multiple gunshot wounds. Dr. Beldea observed one gunshot wound to the right chest, a second bullet hole in right mid-lower back, and a third and fourth bullet hole in the left hand. Xazavier underwent surgery where it was determined that his diaphragm and liver were lacerated. Further, Xazavier's left hand was treated for a through and through gunshot wound, and X-ray imaging determined bullet fragments were present in the wound.

¶ 23    The parties further stipulated that Dr. Stephanie Eugene would testify that she treated Edward for a through and through gunshot wound to his right calf. The wound was cleaned and dressed and did not require surgery. Edward was released from the hospital a few hours later.

¶ 24    Chicago police officer O'Campo testified that, on December 6, 2013, he was assigned to accompany a parole agent performing a parole check on a juvenile at a house on North Moody Avenue. Matthew Berrones opened the door to the basement apartment. While officers were standing in the doorway, Michael Berrones tried to quickly exit the apartment through the same door. Officer O'Campo observed the butt of a handgun sticking out of the Michael Berrones's left pants pocket. The gun was recovered and determined to be a Glock model 22, .40 caliber, with three live rounds inside the magazine.

¶ 25    The parties stipulated that five shell casings were found near the rear porch at the Mulligan Avenue address. These five shell casings were fired from the Glock recovered from Michael Berrones. Further, this Glock was tested and found to be in good working order.

¶ 26    Chicago police officer Rodriguez testified as a gang expert, specifically Latin gangs in Chicago. He explained gang organization, boundaries, hand signals, and general behavior of gangs and their members. Officer Rodriguez testified that there are various reasons why a gang member could be "violated," including if a member decided to leave the gang. Generally, "violations" take the form of a physical beating. He further described various tattoos of the Maniac Latin Disciples gang and identified tattoos from photographs of the defendant as being gang related. Officer Rodriguez identified hand signals from Xazavier's Facebook postings, which showed Xazavier "representing" rival gangs of the Maniac Latin Disciples.

¶ 27    At the conclusion of trial, the jury found the defendant guilty of two counts of attempted first degree murder of Xazavier and Edward, including a special finding that the defendant personally discharged a firearm that proximately caused great bodily harm to both Xazavier and Edward. It further found the defendant guilty of two counts of aggravated battery with a firearm.

¶ 28    The defendant filed a written motion for judgment notwithstanding the verdict or a new trial and a sentencing memorandum. The memorandum focused on the injury suffered by Edward and argued that, given the facts and Illinois case law, Edward did not suffer severe bodily injury. Accordingly, the defendant argued, consecutive sentences were not appropriate. The trial court granted the defendant's motion in part, stating that Edward's gunshot wound did not amount to great bodily harm where he was treated and released the same day.

¶ 29    At the sentencing hearing, Janette Rincon, defendant's cousin, testified that she had known the defendant his entire life and was raised with him. She testified that the defendant was always helpful to her and would frequently babysit her two children. The defendant also visited his grandmother in the nursing home and took care of his father, who is paralyzed. Richard Rincon, also one of the defendant's cousins, testified that, prior to the defendant's incarceration, the defendant was a temporary employee at the same company where Richard worked. Other workers considered the defendant to be a "really good, hardworking guy."

¶ 30    In aggravation, the State highlighted the facts of the case and noted that the defendant faced a minimum sentence of 31 years' imprisonment with respect to the attempted murder of Xazavier and 26 years' imprisonment with respect to the attempted murder of Edward. Further, the State argued that consecutive sentences were mandatory because the injuries to Xazavier constituted "severe bodily harm" under section 5-8-4 of the Unified Code of Corrections (730 ILCS 5/5-8-4 (West 2012)). Because of this, the State noted the minimum possible sentence was 57 years' imprisonment and the maximum possible sentence was 105

years' imprisonment or natural life. The State asked for "an appropriate sentence given the nature of the two shootings."

¶ 31    In mitigation, defense counsel noted the testimony of the defendant's two cousins, wherein they testified that the defendant was a hard worker who was helpful and caring to his family members. Counsel further referred to the presentence investigation report (PSI), which indicated that the defendant had a substance abuse problem with alcohol and drugs. Specifically, counsel noted that the defendant often drank in excess, even resulting in having his stomach pumped, smoked marijuana regularly, and had experimented with other drugs. Counsel referred to the testimony of his codefendant Mendoza that defendant was drunk the night of the shooting and is uncontrollable when he is drunk. Defense counsel noted the defendant's rehabilitation potential and asked for the minimum sentence of 31 years' imprisonment for the attempted murder of Xazavier and 25 years for the attempted murder of Edward, to be served concurrently.

¶ 32    In allocution, the defendant apologized "to the victims and to the families," regretted what had happened, and "accept[ed] full responsibility for [his] actions." He noted that his "drinking problem is not an excuse for what [he] did." He further stated that he was "glad nobody died" but knew he had "to pay the consequences."

¶ 33    The court stated, "I've had the opportunity to review the presentence investigation, the defendant's background, family histories, alcohol and abuse of substance history, social history. I've considered all the factors in aggravation and mitigation." The court found that the injury suffered by Xazavier constituted severe bodily injury mandating the imposition of consecutive sentences.

¶ 34    Following a break in the sentencing hearing to review case law, the court again held that the sentences were to run consecutively. It stated:

"The Court has taken into consideration the facts of the case, the defendant's background, all the factors in aggravation and mitigation, and the defendant's rehabilitative potential. Certainly, the defendant's conduct threatened serious harm. That is implicit in the offenses. I do not consider that in aggravation. My recollection is this was gang motivated."

The court noted that the defendant faced a maximum sentence of natural life imprisonment but believed that the mandatory minimum sentences "certainly are significant jail sentences themselves."

¶ 35    The court sentenced the defendant to "10 years plus 25 years with 35 years" in the Illinois Department of Corrections (IDOC) for the attempted murder of Xazavier. It imposed a sentence of "6 plus 20 years" in the IDOC for the attempted murder of Edward. It further ordered the sentences to run consecutive to each other for a total of 61 years in the IDOC. The court merged the remaining aggravated battery with a firearm counts into the attempted murder counts. The defendant's written motion to reconsider sentence was denied.

¶ 36    The defendant filed a notice of appeal, alleging that there was insufficient evidence to convict him and that the court abused its discretion in sentencing him. In an unpublished order in accordance with Illinois Supreme Court Rule 23 (eff. July 1, 2011), this court affirmed the judgment of the trial court. The defendant subsequently filed a petition for rehearing, arguing that his sentence of 61 years' imprisonment constitutes a *de facto* life sentence, which is unconstitutional because the court imposed the sentence without proper

consideration of his youth.[2] We granted the defendant's petition for rehearing, withdrew our Rule 23 order, and requested the parties to submit supplemental briefing on the issue of whether the defendant's sentence amounts to an unconstitutional *de facto* life sentence.

¶ 37                                                            ANALYSIS

¶ 38     We note that we have jurisdiction to review this matter, as the defendant filed a timely notice of appeal and a timely petition for rehearing. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. Dec. 11, 2014); R. 367 (eff. Nov. 1, 2017); R. 612(b)(14) (eff. July 1, 2017).

¶ 39     On appeal, the defendant challenges the sufficiency of the evidence to prove he was the shooter. He also makes several challenges to his sentence, including that the trial court abused its discretion by imposing an excessive sentence and that his sentence amounts to an unconstitutional *de facto* life sentence. Our analysis begins with the defendant's argument that the evidence was insufficient to prove he was the shooter and sustain his convictions for attempted first degree murder where there were several inconsistencies and contradictions in the witnesses' testimonies.

¶ 40     In reviewing the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. A reviewing court will not substitute its own judgment for the trier of fact on issues of the weight of the evidence or the credibility of witnesses. *People v. Moore*, 2016 IL App (1st) 133814, ¶ 54. The jury, as trier of fact, has the responsibility to weigh the evidence and any inferences derived therefrom, determine the credibility of witnesses, and resolve any conflicts in the evidence. *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 27. We will not reverse a conviction unless "the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 41     In order to sustain a conviction for attempted first degree murder, the State had to prove that the defendant (1) performed an act constituting a "substantial step" toward the commission of murder and (2) intended to kill the victim. See 720 ILCS 5/8-4(a), 9-1 (West 2012); *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. Proof of a specific intent to kill is a necessary element of the offense. *People v. Hill*, 276 Ill. App. 3d 683, 687 (1995). "However, because the specific intent to take a life is a state of mind, it is rarely proven through direct evidence." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. This court has noted that " '[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *Petermon*, 2014 IL App (1st) 113536, ¶ 39 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)). The jury is tasked with determining whether a specific intent to kill exists, and its conclusion will not be disturbed absent reasonable doubt as to the defendant's guilt. *Viramontes*, 2017 IL App (1st) 142085, ¶ 52.

¶ 42     Here, viewing the evidence in the light most favorable to the State, we find the evidence sufficient to sustain the defendant's attempted murder convictions as to both Xazavier and Edward. The record shows that defendant pointed his gun at Xazavier and Edward and said, "I will shoot your uncle in the head right now" or "I'll kill your family." The defendant

---

[2]The defendant raised this issue for the first time in his reply brief.

began to shoot, hitting Xazavier in his hand and abdomen and hitting Edward as he crawled from the bedroom. Both Xazavier and Edward identified defendant as the shooter. Viewing the defendant's statements to Xazavier and Edward, coupled with his subsequent shooting of them, the evidence was sufficient to show a specific intent to kill both Xazavier and Edward. Accordingly, we cannot conclude that no rational jury could find the offense of attempted murder proven beyond a reasonable doubt.

¶ 43    The defendant nevertheless contends that the State failed to prove him guilty beyond a reasonable doubt because Edward's testimony was contradictory to Officer Perez's testimony, Edward's credibility was lacking because he could not identify the defendant in a photo array following the shooting, and Xazavier's testimony was inconsistent regarding who was present in the alley before the shooting and who the defendant shot at first. He argues that these inconsistencies and contradictions established reasonable doubt precluding a guilty finding of attempted first degree murder.

¶ 44    The defendant's arguments essentially ask us to resolve the inconsistencies in the evidence presented at trial and substitute our judgment for that of the jury. However, we will not substitute our own judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses. See *Moore*, 2016 IL App (1st) 133814, ¶ 54 ("it is not the function of the appellate court to retry the defendant"). Any inconsistencies regarding Edward's testimony were brought out at trial, where it was the duty of the jury to resolve the inconsistencies and determine his credibility. Likewise, the jury heard the inconsistencies regarding Xazavier's testimony and resolved them accordingly. "Moreover, the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). Where the jury was presented with the all the testimony, including any contradictions or inconsistencies, we cannot say the evidence was so improbable or unsatisfactory that a reasonable doubt as to the defendant's guilt exists.

¶ 45    In his reply brief, the defendant contends that, given Edward's testimony, "the victim's identification of the shooter remained uncorroborated at the conclusion of the State's case in chief." He further asserts that, because the firearm used in the shooting was recovered from someone other than the defendant, namely Michael Berrones, no reasonable jury could have found the essential elements of attempted first degree murder beyond a reasonable doubt. However, the identification of a single witness is sufficient to sustain a conviction if the witness viewed the offender under circumstances permitting a positive identification. *People v. Starks*, 2014 IL App (1st) 121169, ¶ 48. Here, even if the identification was uncorroborated as the defendant claims, Xazavier made a positive identification of the defendant, not Michael Berrones, as the shooter. Moreover, Xazavier testified that he was in the same gang as Michael Berrones and that Berrones does not look like the defendant. Xazavier explained that he would never confuse the two individuals.

¶ 46    Further, rational jurors could find Xazavier's identification of the defendant reliable. Xazavier viewed the defendant face-to-face before the shooting and had known him through both the gang and grammar school. The patio was illuminated, and Xazavier and the defendant were talking while the defendant held the gun. Xazavier identified the defendant moments after the shooting, at the hospital later that day after seeing a photo array, and in court at trial. Accordingly, Xazavier's identification of the defendant was sufficient to prove that the defendant was the shooter (see *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (listing

factors to consider when assessing the reliability of identification testimony)), and we affirm the defendant's convictions.

¶ 47　　　The defendant next makes several challenges to his sentence. In his opening brief, the defendant argues that the trial court abused its discretion where it failed to properly consider the relevant sentencing factors and imposed an excessive sentence. In his reply brief and his petition for rehearing, the defendant argues that the 57-year mandatory minimum sentence in his case, as well as the 61-year sentence actually imposed by the trial court, violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it constitutes a *de facto* life sentence imposed without proper consideration of his youth. Generally, points not argued in a defendant's opening brief are forfeited and cannot be raised for the first time in the reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *People v. Polk*, 2014 IL App (1st) 122017, ¶ 49. However, forfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review an otherwise forfeited issue. *Great American Insurance Co. of New York v. Heneghan Wrecking & Excavating Co.*, 2015 IL App (1st) 133376, ¶ 81 (Gordon, J., specially concurring). Because this is an important issue trending in our court, we exercise our discretion to consider the defendant's argument that his sentence amounts to an unconstitutional *de facto* life sentence.

¶ 48　　　The defendant claims that his sentence violates both the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution as applied to him because it is a *de facto* life sentence without parole that was imposed without proper consideration of his youth and its attendant characteristics. The defendant concedes that this principle generally only applies to *juveniles* and that he was 18 years old at the time of his offense. However, the defendant calls attention to a recent trend in this court, in which we have recognized that the cognitive abilities of 18- to 24-year-olds are more similar to those of juveniles than to adults and have accordingly ordered new sentencing hearings in a number of cases. The defendant encourages us to apply the same reasoning to his case and order a new sentencing hearing requiring the trial court to consider his youth in mitigation. The State counters that we should follow the bright line drawn by both the United States and Illinois Supreme Courts that divides juveniles from adults at the age of 18.

¶ 49　　　"The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). The United States Supreme Court in *Miller* held that mandatory life-without-parole sentences imposed on juveniles are unconstitutional under the eighth amendment because they prevent the trial court from considering numerous mitigating factors, such as the defendant's age and immaturity. *Id.* at 489. *Miller* and its related jurisprudence expressed concern with the lack of maturity in an adolescent brain: " 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' " *Id.* at 471-72 (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). The United States Supreme Court nonetheless has drawn the line at age 18 for distinguishing juveniles from adults. *Roper*, 543 U.S at 573-74 ("[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18" "however, a line must be drawn").

¶ 50    Our supreme court has expanded *Miller* to hold that both *de facto* life sentences and discretionary life sentences are unconstitutional for juveniles where the trial court did not consider the mitigating factors listed in *Miller*, such as the defendant's youth and immaturity. See *People v. Reyes*, 2016 IL 119271, ¶ 10 (*per curiam*) (the 16-year-old defendant's term-of-years sentence was held to be a mandatory, *de facto* life-without-parole sentence, which is unconstitutional under *Miller*); *People v. Holman*, 2017 IL 120655, ¶ 40 (life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics under *Miller*).

¶ 51    Similar to the eighth amendment, a challenge under the proportionate penalties clause of the Illinois Constitution "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005); Ill. Const. 1970, art. I, § 11 ("[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship"). A defendant's sentence is in violation of the proportionate penalties clause where the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " *Sharpe*, 216 Ill. 2d at 487 (quoting *People v. Moss*, 206 Ill. 2d 503, 522 (2003)). This court has recently held that mandatory life sentences without parole violated the proportionate penalties clause for two 19-year-old defendants where the trial court was unable to consider their youth and its attendant characteristics. *People v. Williams*, 2018 IL App (1st) 151373; *People v. House*, 2015 IL App (1st) 110580.

¶ 52    The defendant raises an as-applied constitutional challenge, which requires a showing that his sentence violates the constitution as it applies to the facts and circumstances of his case.[3] *People v. Thompson*, 2015 IL 118151, ¶ 36. An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97.

¶ 53    As the defendant correctly notes and as discussed *supra*, there has been a recent trend in this court's holding that mandatory life sentences without parole violate the proportionate penalties clause for young defendants where the trial court is unable to consider their youth, even though the defendants are not legally juveniles. However, we are bound by our supreme court's more recent decision in *People v. Harris*, 2018 IL 121932.

¶ 54    In *Harris*, the 18-year-old defendant was convicted of first degree murder, attempted first degree murder, and aggravated battery with a firearm. *Id.* ¶ 1. He was sentenced to a mandatory minimum aggregate term of 76 years' imprisonment. *Id.* This court vacated the defendant's sentences and remanded for resentencing, holding that, as applied to his circumstances, his sentence violated the proportionate penalties clause because the trial court had not considered his youth and its attendant characteristics, even though he was not legally a juvenile. *Id.* ¶¶ 1, 18. Our supreme court reversed that holding. *Id.* ¶ 63. In doing so, our supreme court noted that the defendant's proportionate penalties challenge was an as-applied constitutional challenge, and that "as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶¶ 37, 39. The *Harris* court further noted that the defendant did not raise his as-applied

_____

[3]In contrast, a facial challenge requires a showing that the sentence is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant. *Thompson*, 2015 IL 118151, ¶ 36.

constitutional challenge in the trial court, which meant that the trial court did not hold an evidentiary hearing on the constitutional claim and did not make any findings of fact on the defendant's specific circumstances. *Id.* ¶ 40. Our supreme court reasoned that, in turn, this court "held defendant's sentence violated the Illinois Constitution without a developed evidentiary record on the as-applied constitutional challenge." *Id.* Our supreme court stressed the importance of this court having a sufficiently developed record, created by an evidentiary hearing, in order to properly address a constitutional claim. *Id.* ¶ 41. The *Harris* court concluded:

> "Defendant contends that the record includes sufficient information about his personal history to determine whether the evolving science on juvenile maturity and brain development applies to him. The record, however, includes only basic information about defendant, primarily from the presentence investigation report. An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult. \*\*\* [T]he record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances. Accordingly, defendant's as-applied challenge is premature." *Id.* ¶ 46.

¶ 55    After holding that the record was insufficient to determine the defendant's constitutional claim, our supreme court in *Harris* declined to remand to the trial court for an evidentiary hearing. *Id.* ¶¶ 47-48. Instead, the court determined that the defendant's claim would be more appropriately raised in a postconviction proceeding, which is designed to resolve constitutional issues. *Id.* ¶ 48.

¶ 56    The *Harris* court further determined that, unlike his proportionate penalties clause claim, the defendant's eighth amendment claim was a facial challenge because "[h]e does not rely on his particular circumstances in challenging his sentence under the eighth amendment but, rather, contends that the eighth amendment protection for juveniles recognized in *Miller* should be extended to all young adults under the age of 21." *Id.* ¶ 53. Our supreme court stressed that the United States Supreme Court has drawn a bright line at age 18, that the line was "was not based primarily on scientific research," and that "[n]ew research findings do not necessarily alter that traditional line between adults and juveniles." *Id.* ¶ 60. Noting that other jurisdictions have "repeatedly rejected" claims for extending *Miller* to offenders 18 years of age or older, our supreme court rejected the defendant's eighth amendment facial challenge to his sentence.[4]

¶ 57    Similarly, in this case, the defendant did not raise his constitutional claims in the trial court. Thus, there was never an evidentiary hearing on the matter and the trial court did not make any findings of fact necessary to determine whether *Miller* and its subsequent progeny apply to the defendant's circumstances. The record only contains the defendant's basic information and general data on juvenile brain development. As in *Harris*, the record in this case does not contain any evidence about how that data applies to the defendant's facts and circumstances. Given our supreme court's recent pronouncement in *Harris*, we find that the record before us is insufficient to consider the defendant's constitutional challenges.

---

[4]As the defendant's constitutional claim was a *facial* challenge, the majority in *Harris* made no comments regarding the outcome of a possible *as-applied* challenge to the eighth amendment.

- 11 -

Significantly, the defendant makes clear in his briefs that both of his constitutional claims are *as-applied* challenges, and are therefore dependent upon the specific facts of his case. As there is an insufficient record to address *either* as-applied challenge, the defendant's proportionate penalties clause claim and his eighth amendment claim are both premature, and we cannot resolve them on the basis of the record before us.

¶ 58    Additionally, consistent with *Harris*, we decline to remand this matter to the trial court for an evidentiary hearing. Similar to the *Harris* court, we believe the defendant's constitutional claims would be more appropriately raised in a postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)).

¶ 59    Turning to the final issue in this matter, we now review the defendant's additional challenge to his sentence: that the trial court abused its discretion in imposing a 61-year prison sentence where it failed to adequately consider the mitigating factors and his potential for rehabilitation. He asks us to reduce his sentence.

¶ 60    The trial court has broad discretion in imposing an appropriate sentence, and where, as here, that sentence falls within the range provided by statute, it will not be altered absent an abuse of discretion. *People v. Cole*, 2016 IL App (1st) 141664, ¶ 55. An abuse of discretion exists where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). The trial court is in the superior position to determine an appropriate sentence because of its personal observation of defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). It must consider the relevant sentencing factors, which include the defendant's credibility, demeanor, social environment, age, mentality, habits, and moral character. *Cole*, 2016 IL App (1st) 141664, ¶ 55.

¶ 61    We find the trial court did not abuse its discretion in imposing an aggregate sentence of 61 years' imprisonment. Attempted first degree murder is a Class X felony, punishable by 6 to 30 years' imprisonment. See 720 ILCS 5/8-4(c)(1) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). However, there was a special finding that defendant personally discharged a firearm that proximately caused great bodily harm to Xazavier, requiring an enhancement of 25 years or up to a term of natural life to defendant's sentence for attempted first degree murder of Xazavier. See 720 ILCS 5/8-4(c)(1)(D) (West 2012). Based on this, defendant faced a term of 31 to 55 years' imprisonment, or up to natural life, for the attempted first degree murder of Xazavier.

¶ 62    Additionally, there was a special finding that defendant personally discharged a firearm, requiring a 20-year enhancement to the sentence imposed for attempted first degree murder of Edward. See *id.* § 8-4(c)(1)(C). Based on this, defendant faced a term of 26 to 50 years' imprisonment for the attempted first degree murder of Edward.

¶ 63    Moreover, section 5-8-4(d)(1) of the Unified Code of Corrections requires the imposition of mandatory consecutive sentences where "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2012). Here, the trial court explicitly found that the defendant inflicted severe bodily injury on Xazavier, requiring mandatory consecutive sentences. Therefore, the defendant faced an aggregate term of 57 to 105 years' imprisonment, or up to natural life, for the attempted first degree murders of both Xazavier and Edward.

¶ 64    The defendant's 35-year sentence for attempted first degree murder of Xazavier and his 26-year sentence for attempted first degree murder of Edward, each fall within the statutorily-provided ranges, and we therefore presume they are proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 47. Therefore, his aggregate 61-year prison sentence also falls within the statutory range and is presumed proper. See *id.*

¶ 65    The defendant nonetheless argues that the trial court failed to adequately consider the mitigating factors before imposing sentence. We disagree, as the trial court explicitly stated:

> "The Court has taken into consideration the facts of the case, the defendant's background, all the factors in aggravation and mitigation, and the defendant's rehabilitative potential. Certainly, the defendant's conduct threatened serious harm. That is implicit in the offenses. I do not consider that in aggravation. My recollection is this was gang motivated."

¶ 66    The defendant "must make an affirmative showing that the sentencing court did not consider the relevant factors." *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. Here, the defendant has failed to point to any evidence or any mitigating factors that the trial court supposedly did not consider. Rather, the defendant conclusorily states "[t]he trial court did not point to any particular piece of evidence or factor that leads to his sentence of sixty one years' imprisonment." Further, to the extent the defendant is challenging the trial court's failure to explicitly list the reasons for a particular sentence, our supreme court has held that a trial court is not required to list the particular reasons. See *People v. Davis*, 93 Ill. 2d 155, 162-63 (1982).

¶ 67    The defendant also argues that the trial court failed to adequately consider his rehabilitative potential. Specifically, he notes that, while he did have one juvenile conviction for aggravated battery, he did not have any adult convictions. Further, the defendant had an educational goal of obtaining his general equivalency diploma, had been steadily employed for five months, and was helpful and caring to his family members.

¶ 68    A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. *People v. Ligon*, 2016 IL 118023, ¶ 10; Ill. Const. 1970, art. I, § 11. The seriousness of the offense, and not mitigating evidence, is the most important sentencing factor. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Here, the evidence established that the defendant shot a gun multiple times at Xazavier and Edward, striking them both. The jury concluded that he intended to murder both of them. Given the danger, the trial court could have properly placed more emphasis on the seriousness of the offense over mitigating factors. See *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010) ("[t]he seriousness of the offense or the need to protect the public may outweigh mitigating factors and the goal of rehabilitation").

¶ 69    Moreover, the trial court knew about the defendant's educational aspirations as it was contained in the PSI, which the trial court stated it had considered. The court also heard from the defendant's cousins about his prior work history, as well as the help and support he provided to his family. Further, defense counsel highlighted the defendant's cousins' testimonies in mitigation. It is presumed that when mitigating evidence is presented to the trial court, the court considered it absent some indication to the contrary, other than the sentence itself. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. As this evidence was presented to the trial court, the defendant cannot show that the trial court failed to consider this mitigating evidence or otherwise did not consider his rehabilitative potential.

¶ 70    We recognize that the defendant's sentence is lengthy, but as discussed above, the jury found the defendant guilty of attempting to murder two people with a gun. The record shows that the trial court considered mitigating circumstances as well as the seriousness of the crime. Therefore, the defendant's sentence is not an abuse of discretion.

¶ 71                              CONCLUSION

¶ 72    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 73    Affirmed.