NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231568-U

NO. 4-23-1568

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| HUNTER WATERS, | ) | No. 23CF821 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the circuit court did not abuse its discretion in denying defendant pretrial release.

¶ 2    Defendant, Hunter Waters, appeals the circuit court's order denying him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52, 223 N.E.3d 1010 (setting the Act's effective date as September 18, 2023).

¶ 3    On appeal, defendant argues this court should overturn the circuit court's decision because the State failed to meet its burden of proving by clear and convincing evidence that no

condition or combination of conditions could mitigate the real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case or defendant's willful flight.

¶ 4                                    I. BACKGROUND

¶ 5          On November 30, 2023, the State charged defendant with three counts of first degree murder involving the intentional infliction of blunt force trauma causing death, Class M felonies. Count I alleged "intent to kill or do great bodily harm," in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(1) (West 2022)); count II alleged knowledge the act "created a strong probability of death or great bodily harm," in violation of section 9-1(a)(2) of the Criminal Code (720 ILCS 5/9-1(a)(2) (West 2022)); and count III alleged knowledge the act "would cause the death," in violation of section 9-1(a)(1) of the Criminal Code (720 ILCS 5/9-1(a)(1) (West 2022)). Defendant was also charged with five counts of aggravated battery of a child causing great bodily harm (Class X felonies), including: fracturing the victim's skull, lacerations to the liver, bilateral retinal hemorrhages to the eyes, hematomas to adrenal glands, and fractured ribs, in violation of section 12-3.05(b)(1) of the Criminal Code (720 ILCS 5/12-3.05(b)(1) (West 2022)).

¶ 6          The victim, A.W., was defendant's two-month-old daughter.

¶ 7          On November 30, 2023, the State filed a verified petition to deny defendant pretrial release under section 110-6.1 of the Code (725 ILCS 5/110-6.1 (West 2022)), as amended by the Act. The State alleged defendant was charged with qualifying offenses, and defendant's pretrial release posed a real and present threat to the safety of persons or the community. 725 ILCS 5/110-6.1(a)(1), (1.5) (West 2022). The State further alleged, "[G]iven the nature of the offense and the potential penalties facing this defendant, willful flight is a concern."

¶ 8 A detention hearing was held on December 12, 2023, after defendant sought and obtained a continuance. At the outset of the hearing, defendant's counsel conceded "the presumption is great that the Defendant has committed the offense charged," and "the Defendant potentially does pose a real and present threat to the safety of any person or persons of the community." The only issue defendant contested was "whether or not there's a condition or combination of conditions that the Court could order that could mitigate" any threat of safety to any person or persons or defendant's flight risk.

¶ 9 At the detention hearing, the State proffered the following information in support of its verified petition. First, it asked the circuit court to find probable cause pursuant to section 6.1(b) of the Code (725 ILCS 5/110-6.1(b) (West 2022)) based on the affidavit of probable cause tendered to the court. The State's affidavit provided as follows: On November 26, 2023, Pekin fire and rescue was dispatched to a home in Pekin, Illinois, on the report of a two-month-old female who was having trouble breathing. Emergency medical technicians arrived and identified the two-month-old as A.W. (born September 2023). A.W. was immediately transported to OSF Saint Francis Hospital to undergo medical treatment. A.W. was observed to have visible marks on her body, including bruising to the right arm and left upper chest. A.W.'s eyes displayed petechiae on the outer lids, her head appeared misshapen, and she was unresponsive, unable to breathe on her own, and intubated. Medical personnel advised A.W. had a large hematoma to the back of the head putting significant pressure on her brain. Further imaging revealed A.W. to have a fractured skull, numerous and scattered subarachnoid hemorrhages, three distinct subdural hemorrhages, a midline hematoma beneath bone, a lacerated liver, hematomas to both adrenal glands, severe bilateral retinal hemorrhages, and multiple broken ribs. Defendant initially stated A.W. woke up that morning crying. He attempted to feed her, but she would not eat and

appeared to be choking. Defendant initially had no explanation for A.W.'s injuries, despite admitting to being alone with A.W. in their bedroom from approximately 12:45 a.m. on November 26, 2023, until the 911 call at approximately 7:45 a.m. the same day. Detective Allison Palmer, of the Pekin Police Department, spoke with both defendant and A.W.'s mother, Abigail Cunningham, when she arrived at OSF Saint Francis Hospital. Cunningham confirmed defendant was left alone with A.W. around 12:45 a.m., when she left to be taken to the emergency room by her mother. Both defendant and Cunningham stated A.W. appeared to be normal the day and night of November 25, 2023, with no signs of injury. Defendant gave Palmer more details about his morning with A.W. after she woke up, admitting to being frustrated, handling A.W. in a rough manner, causing her head to flop backward, and dropping A.W. onto his bed from a few inches, stating she may have hit her head on his Xbox controller. Medical personnel stated defendant's explanation was inconsistent with the medical evidence. Child abuse specialists indicated the injuries were severe and consistent with inflicted child physical abuse.

¶ 10 On November 28, 2023, Detective Palmer interviewed defendant again. Defendant admitted to being overwhelmed, frustrated, and angry with A.W. and her inconsolable crying. He admitted to handling her roughly while changing her diaper, striking her head on a changing table. He admitted to Palmer that he held her tightly around the rib cage and struck her head against his bedroom door. Later that night, A.W. succumbed to her internal injuries and was pronounced dead due to the catastrophic brain injuries she sustained.

¶ 11 The State also proffered that A.W.'s biological mother, Cunningham, was 18 years old and functioned at a "diminished mental capacity." She met defendant through the "Best Buddies Program" in Pekin, where he was a mentor and she was a mentee. The State further

proffered two orders of protection, Tazewell County case No. 21-OP-957 (People's exhibit No. 13), an *ex parte* emergency order, and Tazewell County case No. 22-OP-242 (People's exhibit No. 14), a plenary order, both granted against defendant. The plenary order was admitted and after argument by counsel, the circuit court agreed to allow case No. 21-OP-957 to be admitted, but it acknowledged that, as an *ex parte* emergency order which was eventually dismissed, it would be given "little to no weight."

¶ 12　　　　The emergency order entered in case No. 21-OP-957 was for "Harassment, Physical Abuse, Stalking, and Interference with Personal Liberty," obtained by the father of a minor female defendant had contacted through Snapchat in October and November 2021, in one instance asking her "if she wanted to have sex then asking her if he needed to bring condoms so that they can have sex in his car." The phone taken by the parent and given to the police contained multiple sexually graphic conversations, sexual photos of defendant, and requests for sexual photos of the minor child, as well as requests for sex. The parents had also learned defendant came to their house without their knowledge.

¶ 13　　　　The plenary order entered in case No. 22-OP-242 was by another female with whom defendant had some form of relationship and was entered to prevent "Harassment, Stalking, and Interference with Personal Liberty." Defendant made threats to kill the petitioner in April 2022, after meeting with her earlier, where, according to the petitioner, he "pullet [*sic*] a gun out of his bag. he [*sic*] pointed the gun at me then at his head then back at me then I talket [*sic*] him into puting [*sic*] the gun down but he smashed it instead."

¶ 14　　　　The State also proffered evidence from the Pekin Park District that on September 7, 2023, officers from the Pekin Park District and the Pekin Police Department were dispatched to the park on a report of a white male who was flashing a handle of what appeared to be a

handgun in the skate park while three other individuals were present. The white male was identified as defendant. Once he was approached, he admitted flashing the handle of what appeared to be a handgun to the individuals in the skate park. The guns were located in defendant's vehicle and were found to be airsoft pistols.

¶ 15        The State then proffered that Dr. Patterson, a board certified pediatric forensic pathologist, conducted an eight-hour forensic autopsy of A.W. on December 1, 2023, and "[h]e would testify that as part of the process, photographs were taken that fairly and accurately represent the condition of A.W. at the time of autopsy and the nature and status of her injuries." Some of the photos were admitted over defendant's objection.

¶ 16        The State also indicated at the time the paramedics arrived at the residence, "and at the time frame that the People are alleging that this offense occurred," defendant was present in the home, along with defendant's mother, Jennifer Waters, her "significant other," and defendant's two younger siblings. At the State's request, the circuit court also took judicial notice of the pretrial services bond report.

¶ 17        Defendant presented the testimony of his mother, Jennifer Waters, his father, Buddy Waters, Rachel Merry, Jennifer Waters's significant other, and defendant's grandmother, Mary Bursott, who all testified to having signed affidavits accepting responsibility to provide supervision as "third party custodians" of defendant if he was released. On cross-examination, defendant's mother admitted being in the residence on the night police responded. Defendant testified he would agree to remain on a GPS monitor if released and would stay at his mother's home unless preapproved by the court or probation or pretrial services.

¶ 18        During the parties' arguments to the circuit court, the State argued both the seriousness of the charges and how it was "the greatest motivation for flight" for defendant. The

State contended the extended-term sentencing component to defendant's case enhanced the risk of flight if released. It further argued defendant's "history and characteristics for lack of control of his emotions, his ability to posture violence," evident from the orders of protection and the incident at the park in Pekin, should be considered.

¶ 19    The State argued defendant was a threat to Cunningham, in particular, because of his manipulative behavior arising from the fact "this Defendant actually met her and started a relationship through [the Best Buddies program] where he was supposed to be a mentor." It noted the order of protection in case No. 21-OP-957 evinced defendant's pattern of taking advantage of "individuals who are of lesser capacity," where he was "attempting to pressure a 15-year-old child into having sexual intercourse with him." The State also referenced defendant's statements to the Pekin Police Department detective "that relate to his inability to curb his frustration, to handle emotional triggers, to temper his violence, and specifically his statements about hitting A.W.'s head on the door of his bedroom."

¶ 20    The State noted the various factors to be considered under section 110-6.1(g)(9) of the Code (725 ILCS 5/110-6.1(g)(9) (West 2022)). It argued the relevance of each, including defendant's concession and the substantial evidence of his guilt, along with his ongoing danger to Cunningham and the community at large. The State noted defendant's threatened possession or access to weapons, as evidenced by the Pekin park incident. The State pointed to the domestic nature of the offense and the nature and circumstances of the offense in general, "the severity, the duration, and the physical injury to this specific victim," who was 71 days old at the time of her death. The prosecutor then described the admitted autopsy photos and the affidavit of probable cause outlining the nature and severity of A.W.'s injuries, including:

"approximately a 1 inch contusion or bruise to the front of A.W.'s head extending into her hairline and down onto the forehead.

*** Significant bruising is seen behind [the right] ear up into the hairline and protruding down into the neck and lower cranial area.

*** bruising around the upper ribcage and abrasions underneath the [right] arm ***.

*** an approximate 4 inch hematoma, bruise contusion to the back of A.W.'s head. ***

　　　***

*** a fracture to the back of her skull approximately 4 inches and 8 tenths [*sic*] long. That the fracture was wide enough to expose portions of her brain.

*** 12 broken ribs. *** a midline hematoma or pocket of fluid and blood from blunt force underneath bones in her sternum.

*** fracturing to [the] left arm, and ***.

*** hematomas to both of her adrenal glands, damage to a kidney, lacerations to her liver. *** pools of blood were found in both her spinal column and in her cranial area."

¶ 21　　　　Arguing against any consideration of home confinement, GPS monitoring, or third-party custodians as appropriate mitigating factors, the State pointed out, "Being in his home does not stop him from engaging in extreme violent behavior. *** location does not deter this defendant ***. This act of violence was committed in a house full of people." The State described how, at the time of the offense, defendant's mother, Jennifer Waters, was home, along with her significant other, Rachel Merry, and defendant's younger brother, G.W., and younger

sister, Aspen. Further, it mentioned the pretrial services report indicated the home was not large. The State also argued, "[T]here is no deterrent to this Defendant for his actions because he could not control his aggression, his violence, and his rage, a no contact order would mean nothing in this case," and "[t]here is nothing this Court could ever impose upon this particular Defendant that can mitigate the concerns and danger that this specific Defendant poses," asking the circuit court to detain defendant as a result.

¶ 22    Defense counsel argued, despite the "tragic circumstances," which counsel did not deny and described as "absolutely heartbreaking," the State was "simply inflaming the situation and inflating the situation." Instead, defense counsel asserted, "[Defendant] has no history of hurting people. This is sadly what happens way too many times across the country."

¶ 23    Counsel also contended defendant was not a flight risk, was a "long-time resident of Pekin," had been at the same residence for 10 years, and had numerous family members either residing with him or in the area. Counsel pointed to the four people who had agreed to be "third party custodian[s] and to keep an eye on him 24/7." He also referenced an indication in the pretrial services bond report "that there may be some autism spectrum disorder." Counsel noted defendant had a minimal criminal history, "three petty traffic cases," with one resolved by court supervision. Counsel outlined the equally minimal criminal history of defendant's father and mother, while noting his mother's significant other, Rachel Merry, and his grandmother had "no criminal history whatsoever."

¶ 24    Defendant requested release with conditions: no contact with anyone under 18 years of age, home confinement with "absolutely no movement whatsoever unless it's preapproved by the Court," GPS monitoring, with "24/7" supervision by the "third party custodians," no contact with Cunningham, and any other conditions the circuit court considered

appropriate. Counsel argued the State "failed to meet [its] burden by clear and convincing evidence that there are no combination of conditions that mitigate the risk."

¶ 25 In determining whether defendant should be released from pretrial detention, the circuit court advised it was

> "taking into consideration the evidence presented by proffer or by testimony in court, relevant statutes regarding the [Act], relevant factors as contained in [sections] 110-6.1 and 110-5, relevant standards of burden of proof, that being clear and convincing evidence, and argument of counsel, and all of the exhibits which [the court has] had a chance to review and read, all those stipulated to make the record."

¶ 26 The circuit court found

> "the proof is evident and the presumption great the Defendant has committed a qualifying offense.
>
> The Defendant poses a real and present threat to the safety of persons or the community. So the question comes down to Defendant's asking to be released with conditions of pretrial release as argued by his attorney or any other that the Court would come up with."

The circuit court declined to find a risk of willful flight. Having heard the evidence, the court decided it was appropriate to consider the *ex parte* order of protection but would "give it much less weight than the other one when [defendant] was present *** and able to participate."

¶ 27 The circuit court found the nature and circumstances of the offense "has a reasonable bearing on the Defendant's propensity for violent and abusive or assaultive behavior," noting the "severe, acute, very traumatic, violent injuries," along with the information

contained in the probable cause affidavit were "concerning." The court considered the six-month plenary order of protection where a gun was referenced, along with the other emergency order involving defendant's "alleged interaction with *** somebody in high school or a minor," and found them concerning, expressly noting defendant's possession or access to weapons and use of his mentor/mentee relationship with Cunningham. The court referenced the "weight of the evidence" and found "the presumption is great."

¶ 28     Referencing the proposal by defendant's family members to watch him 24 hours a day, the circuit court found it could be done, although it would be "a monumental undertaking." While there was "no evidence before the Court at this time of any diagnosis of autism," the court noted the "assertion by the mother that [defendant] is very immature." It concluded, however, that requiring defendant to be supervised 24 hours a day by the same people who were in the home when this offense was alleged to have occurred "would make no sense." The court found defendant would be detained and "[n]o condition or accommodations—combination of conditions set forth in [subsection] (b) [of section 110-10] would mitigate the real and present threat to the safety of any person or persons in this case."

¶ 29     The circuit court then entered a written order summarizing its reasons for denying pretrial release and finding (1) defendant was charged with a detainable offense and (2) he poses a real and present threat to the safety of any person or persons or the community based on the specific and articulable facts of the case. The factors upon which these conclusions were based were identified by the court to include: (1) the violent nature of the offense, (2) the identity of those to whom defendant poses a threat and the nature of the threat, (3) the age and physical condition of the victim or complaining witness, (4) defendant being known to possess weapons or have access to weapons, and (5) defendant's history of violent/abusive behavior. The court

also referenced, defendant's "conduct related to minors, [defendant's] immaturity, facts of this case relating to home confinement, and all other factors put onto the record."

¶ 30    The circuit court also found the threats enumerated above could not be mitigated by any release condition or combination of conditions because "of all factors placed in the record by The Court, concerning pre-trial services listed in [Defendant's exhibit A and] consideration of all statutory factors [and] peculiar facts of this case."

¶ 31    After the circuit court entered its written order denying defendant pretrial release, defendant filed his notice of appeal under Illinois Supreme Court Rule 604(h)(1)(iii) (eff. Dec. 7, 2023).

¶ 32    This appeal followed.

¶ 33                    II. ANALYSIS

¶ 34    On February 6, 2024, the Office of the State Appellate Defender, defendant's appointed counsel on appeal, filed a notice with this court indicating it was not filing a Rule 604(h) memorandum. Thus, we examine the arguments set forth in defendant's notice of appeal.

¶ 35    Defendant's notice of appeal was a completed form substantially adopting the appearance and content of the forms provided in the Article VI Forms Appendix to the Illinois Supreme Court Rules (see Ill. S. Ct. R. 606(d) (eff. Dec. 7, 2023)), by which defendant seeks review of an order denying pretrial release with conditions. The form lists several possible grounds for appellate relief and directs appellants to "check all that apply and describe in detail." Defendant checked one ground for relief and typed several sentences in support of his claim.

¶ 36    The only ground for relief defendant checked alleged the following:

        "The State failed to meet its burden of proving by clear and convincing

        evidence that no condition or combination of conditions can mitigate the real and

present threat to the safety of any person or persons or the community, based on the specific, articulable facts of the case, or the defendant's willful flight."

Defendant explained:

> "The Defense established that there were 4 eligible Third Party Custodians available to supervise the defendant at his mother's house 24/7. Further, the defendant had no prior criminal history and the circumstances that led to the alleged offense—defendant being in charge of a baby or small child—were not likely to be repeated."

¶ 37 Before a circuit court denies pretrial release, the State must prove by clear and convincing evidence that "no condition or combination of conditions set forth in subsection (b) of Section 110-10 of this Article can mitigate (i) the real and present threat to the safety of any person or persons or the community." 725 ILCS 5/110-6.1(e)(3)(i) (West 2022). Section 110-6.1 of the Code instructs the court to consider "the specific articulable facts of the case" and provides nine factors the court may consider when assessing the real and present threat allegation. See 725 ILCS 5/110-6.1(g) (West 2022).

¶ 38 The determination of whether pretrial release should be granted or denied is reviewed under an abuse-of-discretion standard. See *People v. Jones*, 2023 IL App (4th) 230837, ¶¶ 27, 30. "An abuse of discretion occurs when the circuit court's decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with the position adopted by the [circuit] court." (Internal quotation marks omitted.) *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9, 143 N.E.3d 833. Under this standard, a reviewing court will not substitute its own judgment for that of the circuit court simply because it would have analyzed the proper factors differently. *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11. Likewise, "we will not substitute

our own judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 44, 123 N.E.3d 393.

¶ 39 Here, defendant has not shown how the circuit court abused its discretion in finding there were no condition or combination of conditions which could mitigate the real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case. Instead, defendant merely realleges some of the facts presented to the court, asking us to reweigh them. This we will not do. *Vega*, 2018 IL App (1st) 160619, ¶ 44.

¶ 40 After a full hearing, where defendant and his counsel were given an adequate opportunity to confer, the circuit court entered an order meeting the requirements of section 110-6.1 of the Code. Based on the specific, articulable facts presented, coupled with the concessions made by defendant's counsel, the only issue before the court was whether there were any conditions or combination of conditions under subsection 110-10(b) of the Code (725 ILCS 5/110-10(b) (West 2022)) which could mitigate the real and present threat. The court made specific and detailed findings in its oral pronouncement and entered written findings that pretrial release should be denied because less restrictive conditions would not avoid that threat. See 725 ILCS 5/110-6.1(h)(1) (West 2022).

¶ 41 Because the circuit court complied with the requirements of the Code and made all the necessary findings, based on this record, we find no reason to conclude the court's decision was "arbitrary, fanciful[,] or unreasonable." *Simmons*, 2019 IL App (1st) 191253, ¶ 9. Moreover, the court provided specific, articulable facts for its decision. Overall, the record supports the court's determination that the State showed by clear and convincing evidence there was no condition or combination of conditions the court could order that would mitigate any threat to the safety of any person or persons. Defendant's only suggestion was to permit some of

the same people who were present in a 1200-square-foot house the night he admits inflicting catastrophic injuries on his two-month-old daughter to supervise him. The court referenced the other troubling behaviors of defendant, evinced by the facts surrounding the orders of protection and the Pekin Park incident, in conjunction with the facts of these offenses. Accordingly, we do not find the court's conclusion to be one where " 'no reasonable person would agree with the position adopted by the [circuit] court.' " *Inman*, 2023 IL App (4th) 230864, ¶ 17 (quoting *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010)).

¶ 42                                  III. CONCLUSION.

¶ 43          For all these reasons, we affirm the circuit court's judgment.

¶ 44          Affirmed.