2020 IL App (1st) 182610-U
Order filed July 31, 2020

FIRST DISTRICT
FIFTH DIVISION

No. 1-18-2610

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 05529-01 |
| | ) | |
| PIERRE MANNING, | ) | Honorable |
| | ) | Thomas V. Gainer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirmed defendant's conviction for attempted first degree murder, finding that the State proved him guilty beyond a reasonable doubt, his trial counsel committed no ineffective assistance, the State's closing argument did not deprive him of a fair trial, and that he acquiesced in the trial court's response to a jury note.

¶ 2    A jury convicted defendant, Pierre Manning, of the attempted first degree murder of the victim, Fred Thomas, and found that during the commission of the offense, he personally discharged a firearm. The trial court sentenced him to 28 years' imprisonment. On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) his trial counsel committed ineffective assistance; (3) the prosecutor made improper remarks during

closing arguments depriving him of a fair trial; and (4) the court's response to a jury note was error. We affirm[1].

¶ 3     At trial, Thomas's wife, Shante, testified that at about 10 p.m. on February 24, 2009, Thomas drove their car to a gas station near Cicero and Augusta and pulled in front of a self-service pump. About 15 seconds later, a red SUV entered the gas station and bumped their car from behind and then drove around to the other side of the gas pump.

¶ 4     Shante and Thomas exited their car to check for damage. Shante went to the back of the car and Thomas briefly joined her there before he walked next to the driver's side door. Defendant exited the front driver's seat of his SUV and began walking toward them, in front of their headlights. He was wearing a red hoodie. Shante saw defendant smile, then he pulled out a gun and began shooting Thomas, who fell inside the car. Shante went inside the car, laid on top of Thomas, and told defendant to stop shooting. Defendant walked back to his SUV. The back window rolled down and she saw three men inside.

¶ 5     The police arrived just as defendant was pulling away. Shante pointed out his vehicle to the officers, who left the gas station and began following it. An ambulance arrived and took Thomas to the hospital. Shante went to the police station, viewed a lineup at about 4 a.m., and identified defendant as the shooter. Shante testified before the grand jury on March 16, 2009, and identified defendant from a photograph.

¶ 6     Thomas testified that several hours prior to the shooting, he took Ecstasy in pill form and also drank alcohol. He was not under the influence of Ecstasy or alcohol at the time of the shooting.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

¶ 7 Thomas testified consistently with Shante about pulling their car into a gas station at Augusta and Cicero. The lighting was "really bright." He parked next to a gas pump. A red vehicle drove up and sideswiped the back passenger quarter panel of the car and then drove to the opposite side of the gas pump.

¶ 8 Thomas and Shante exited their car to inspect the damage. Thomas saw defendant exit the driver's side of the red vehicle and walk toward him. Thomas has known defendant, whose nickname is Peewee, since 2006. Defendant raised a silver gun and shot him 11 times in the hand, forearm, hip and legs and he fell inside of the car and was "basically playing dead." Shante then laid on top of him and asked defendant to stop shooting. Defendant left, and an ambulance arrived and took him to the hospital.

¶ 9 On February 25 at 7:30 p.m., detectives interviewed Thomas in the hospital and showed him a photo array from which he identified defendant as the person who had shot him. When asked how he was able to identify defendant to the police, Thomas testified, "Because I looked at him dead in his face when he walked up to me and started shooting." Thomas testified before the grand jury in March 2009 and again identified defendant from a photograph.

¶ 10 On cross-examination, Thomas stated that he focused on defendant's face as he approached within six or seven feet of him, and that he saw defendant smiling while holding the gun. Thomas did not remember what defendant was wearing and did not recall telling officers that he was wearing a grey leather jacket.

¶ 11 Officer Daniel Bacoulis testified that at about 10:30 p.m. on February 24, 2009, he and his partner were on patrol when they heard gunshots near the gas station at Augusta and Cicero. They went to the gas station and saw a woman yelling that her companion had been shot, and she pointed

to a red SUV that was driving away at a high rate of speed. The officers radioed for assistance and gave chase. They eventually lost sight of the vehicle.

¶ 12    Officer Gerardo Perez testified that at about 10:45 p.m. on February 24, 2009, he and his partners were at Homan and Chicago when they heard a call about a police chase of a red SUV going east on Augusta from Cicero. They turned onto Augusta and pursued the red SUV, which eventually turned onto Lawndale and crashed into a pole and a parked car. Three males, including defendant, exited the vehicle and began running away. Officer Perez chased defendant into the backyard of a house and saw him dive underneath some bushes. The officer pulled defendant out and placed him under arrest.

¶ 13    Officer Perez identified a photograph showing a black semiautomatic firearm near the gas pedal of the red SUV. The gun was collected and inventoried by the police. A glove was also recovered from the vehicle.

¶ 14    Officer Andrew Camarillo testified that at about 10:30 p.m. on February 24, 2009, he was on patrol with two other officers when they heard the radio call about the police chase of the red SUV. They entered the chase and saw the red SUV crash after turning on Lawndale. Officer Camarillo ran after one of the men who exited the red SUV, Ricardo Bryant. While running, Bryant threw away a chrome colored revolver into a gangway. Officer Camarillo arrested him one block over and the revolver was recovered by police and inventoried.

¶ 15    On cross-examination, Officer Camarillo testified that he did not notice whether any of the men who exited the car was wearing a red hoodie. He did not recall anything about what the men were wearing.

¶ 16    Officer Jason Edwards testified that he and his partner heard the call regarding the car chase and went to the 900 block of Lawndale, where other officers told him that the men had run away

from the crashed red SUV. Officer Edwards then observed James Jackson, wearing a red T-shirt and blue jeans, jump into a yard at the south end of the alley. Officer Edwards followed Jackson into the yard and arrested him. Jackson did not have a weapon on him.

¶ 17    Sergeant Russell Egan testified that at about 10 p.m. on February 24, 2009, he and his partner were assigned to investigate the shooting at the gas station at Cicero and Augusta. When they arrived at the gas station, he saw a Chevy Caprice with bullet holes in it and he also saw about 9 or 10 shell casings from a .40 or .45 caliber semi-automatic weapon on the ground near the car. He described the lighting at the gas station at that time as "very good."

¶ 18    Paramedics were at the scene attending to Thomas, who had been shot multiple times. Sergeant Egan talked to Thomas, who told him that the shooter wore a grey leather jacket. The paramedics eventually took Thomas to the hospital. Officers transported Shante to the police station to be interviewed.

¶ 19    Sergeant Egan heard over the police radio that the red SUV had crashed in the 900 block of Lawndale and he went to the scene and learned that defendant, Jackson, and Bryant had been taken into custody. He looked inside the SUV and saw a semi-automatic gun underneath the gas and brake pedals. He also saw a single black glove and "multiple clothing items," but he did not see a red hoodie or grey leather jacket.

¶ 20    The next morning, Shante viewed a lineup and identified defendant as the shooter. At about 7:30 p.m., Sergeant Egan went to the hospital and showed Thomas a photo array. Thomas identified defendant, who he called "Peewee," as the shooter.

¶ 21    Aaron Horn, a forensic scientist employed by the Illinois State Police Forensic Science Laboratory, testified that through testing and analysis, he identified the 11 cartridge casings

recovered from the scene of the shooting as having been fired from the semiautomatic weapon found in the red SUV.

¶ 22    Mary Wong, another forensic scientist, testified that she performed gunshot residue (GSR) testing on swabs taken from the steering wheel and gear shifter from the red SUV and determined that the area sampled was either in the vicinity of a discharged firearm or came in contact with a primer gunshot residue related item. She also performed GSR testing on swabs taken from defendant's hands and determined that he may not have discharged a firearm with either hand, or if he did, that the particles were either removed by activity, were not deposited, or were not detected by the procedure. Wong explained that gunshot residue can be removed by "any activity," including by touching a surface, washing one's hands, wearing a glove, or putting one's hands in his pocket. Defendant's diving into the bushes just prior to his arrest and his being dragged out of the bushes by his ankles could also have removed the gunshot residue. The length of time between when the shooting occurred at about 10:30 p.m., and when the gunshot residue swab was administered to defendant at 2:45 a.m., also could make it difficult for the GSR testing to detect gunshot residue.

¶ 23    During jury deliberations, the jury submitted a note, and the following colloquy occurred between the trial court and counsel:

> "[THE COURT]: The jury sent a note out. It's actually three questions. The first question is, can we convict on attempt murder based on the fact that *** he was in the car? The second question is, what is an act, and parenthetically they say, regarding attempt first degree murder? And the third question is, what is the definition of substantial step regarding, and parenthetically, regarding attempt first degree murder? State's Attorney, any suggestions?

[ASSISTANT STATE'S ATTORNEY]: You've heard all the evidence. Please continue to deliberate.

[THE COURT]: Mr. Walsh?

[DEFENSE ATTORNEY]: Well, it sounds like they're looking at an accountability issue. And since we don't have an accountability allegation here, I don't want to mislead the people.

[THE COURT]: In order not to mislead them, I think they should be told, you have heard all the evidence, you have your instructions, please continue to deliberate.

[DEFENSE ATTORNEY]: Or—yeah, that's fine. I was going to say or instructions that apply to this case.

[THE COURT]: Right. Well—

[DEFENSE ATTORNEY]: That's my only thought is, it means the same thing.

[THE COURT]: You have heard all the evidence, comma, you have the instructions, comma, please continue to deliberate. I'm going to sign it. *** Any objection?

[DEFENSE ATTORNEY]: No objection, Judge."

¶ 24 Less than an hour later, the jury returned its verdict against defendant.

¶ 25 Following defendant's conviction, he filed a motion for DNA testing on two swabs obtained from the semiautomatic weapon found inside the red SUV and on two swabs obtained from the gun discarded by Bryant. The trial court denied the motion.

¶ 26 Defendant filed an amended motion for a new trial arguing that his counsel committed ineffective assistance by failing to seek DNA testing of the swabs obtained from each firearm and by failing to present evidence that he was wearing a black coat when arrested, which was different

from the description of his clothing as given by Shante and Thomas. Defendant also contended that the prosecutor made improper remarks during closing arguments, that the court's response to the jury note was error, and that the State failed to prove him guilty beyond a reasonable doubt.

¶ 27    An evidentiary hearing was held on the claim of ineffective assistance. Defendant's trial counsel testified that prior to trial he was made aware that the two guns had been swabbed and therefore that there was a possibility of obtaining DNA information from them. Counsel further testified:

"Q.  Did you discuss with [defendant] the fact that the guns had been swabbed for DNA, possible DNA evidence?

A. Yes, I did.

Q. And in the course of that conversation, did [defendant] ask you to have the State test the gun for DNA?

A. We discussed that issue, and after we discussed it, it was decided that we would just let that go. *** I explained to him that we had gunshot residue that *** came back negative to him. I had concerns of raising the issue of the DNA for both. I don't know what was going to come off of the weapon ***. I was concerned about creating some evidence that might be detrimental to [defendant's] case."

¶ 28    The trial court denied defendant's amended posttrial motion.

¶ 29    On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of the attempted first degree murder of Thomas. An individual commits attempted first degree murder when, with specific intent to kill, he takes any act that constitutes a substantial step toward the commission of the murder. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. The act of

firing the gun at the victim supports the conclusion that he did so with the specific intent to kill. *Id.*

¶ 30　The standard of review of a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found each of the essential elements beyond a reasonable doubt. *People v. Baldwin*, 2020 IL App (1st) 160496, ¶ 17. We will not substitute our judgment for that of the trier of fact on questions involving the credibility of the witnesses or the weight of the evidence. *Id.* A single witness' identification of defendant is sufficient to sustain his conviction if the witness viewed defendant under circumstances permitting a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Circumstances to be considered when evaluating an identification include: (1) the opportunity the witness had to view defendant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of defendant; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Id.* at 307-08.

¶ 31　In the present case, the *Slim* factors weigh in favor of the reliability of Shante's and Thomas' identification of defendant, as: the shooting occurred in a brightly lit gas station; Shante and Thomas were focused on defendant's face as he walked toward them; Thomas recognized defendant as someone he knew; Shante and Thomas each identified him within hours of the confrontation and again at the grand jury and at trial, and they demonstrated certainty in their respective identifications. Viewing Shante's and Thomas' testimony in the light most favorable to the State, in conjunction with the evidence that the weapon used in the shooting was recovered from underneath the gas pedal of defendant's red SUV and that gunshot residue was found on the

steering wheel/gear shifter, any rational trier of fact could find defendant purposely shot Thomas multiple times with the intent to kill and therefore was guilty of attempted first degree murder.

¶ 32    Next, defendant contends that his counsel committed ineffective assistance. To prevail on a claim of ineffective assistance, defendant must show that his trial counsel's performance was objectively unreasonable and that he was prejudiced thereby such that, but for counsel's unprofessional errors, the result of the trial would have been different. *People v. Gunn*, 2020 IL App (1st) 170542, ¶¶ 93-96. Defendant must overcome the strong presumption that the challenged action may have been the product of sound trial strategy. *Id.* ¶ 94. Generally, matters of trial strategy are immune from claims of ineffective assistance of counsel. *Id.* Our review is *de novo*. *Id.* ¶ 91.

¶ 33    Defendant's first claim of ineffective assistance relates to his counsel's failure to seek DNA testing of the two swabs of each firearm. Counsel explained at the posttrial evidentiary hearing that his decision not to seek such DNA testing was one of strategy, as the GSR tests had come back negative to defendant and he did not want to take the chance that the DNA tests on the guns might come back positive to him, thereby "creating some evidence that might be detrimental" to his case. Counsel's strategic decision not to seek DNA testing of the firearms is immune from defendant's claim of ineffective assistance. *Id.*

¶ 34    Defendant cites *People v. Johnson*, 2020 IL App (3d)160675 as compelling a different result. In *Johnson*, the defendant there argued that his trial counsel provided ineffective assistance by failing to request testing of the DNA swabs from a firearm allegedly used in the offense. *Id.* ¶ 33. We noted that a defense counsel's decision not to have a DNA swab tested where the State has conducted no testing would ordinarily be considered a clear matter of trial strategy, as counsel reasonably could decide that the potential of the test results coming back in defendant's favor are

outweighed by the risk that the results would be incriminating. *Id.* ¶ 35. However, in the case before it, counsel was under the misapprehension that no DNA swabs had been taken from the firearm. *Id.* ¶ 36. As counsel's failure to request DNA testing on the swabs was oversight rather than strategy, we held that he rendered deficient performance. *Id.*

¶ 35 In the present case, by contrast, counsel was aware of the DNA swabs and made the tactical decision not to have them tested. Accordingly, *Johnson* is inapposite.

¶ 36 Defendant next claims his counsel was ineffective by not cross-examining the State's forensic scientists regarding their failure to conduct DNA testing on the swabs recovered from the firearms and by not discussing the absence of such DNA testing during closing argument. However, had counsel so cross-examined the forensic scientists, the State would have been entitled to ask on redirect examination whether such testing was available to the defense. See *People v. Patterson*, 217 Ill. 2d 407, 446 (2005); *People v. Kelley*, 2015 IL App (1st) 132782, ¶¶ 60-69. Had counsel argued at closing that the State could have requested DNA testing, the State would have been entitled to respond in rebuttal that defendant could also have requested testing (see *People v. Kliner*, 185 Ill. 2d 81, 155 (1998)). Such redirect examination and rebuttal argument would have raised the inference that defendant failed to request DNA testing on the firearms because he knew that his DNA would be found thereon. Counsel's decision not to invite such testimony or argument was a strategic one that is immune from defendant's claim of ineffective assistance. *Gunn*, 2020 IL App (1st) 170542, ¶ 94.

¶ 37 Defendant contends that counsel's testimony during the posttrial hearing shows that his failure to argue that the State could have requested DNA testing on the swabs recovered from the guns was not a strategic one, and that he intended to make that argument but forgot to do so and thereby rendered ineffective assistance. We disagree. Counsel merely testified to not remembering

making any argument regarding the State's failure to conduct DNA testing on the swabs obtained from the guns. Counsel did not testify or imply that his decision to forego arguing the State's failure to perform DNA testing was anything other than strategic.

¶ 38    Next, defendant contends his trial counsel was ineffective for failing to present evidence that police inventory reports indicated that he was wearing a black coat when arrested, which was contrary to the description of the shooter's clothing as testified to by Shante and Thomas. We find no ineffective assistance, where counsel elicited other evidence at trial casting doubt as to whether Shante's and Thomas' description of the shooter's clothing matched that of defendant. Specifically, counsel's cross-examination of Officer Edwards established that Jackson, who was wearing a red T-shirt at the time of his arrest, most closely matched Shante's description of the shooter as wearing a red hoodie. Counsel also elicited testimony from Sergeant Egan on cross-examination that although Thomas stated that the shooter wore a grey leather jacket, such a jacket was not found in defendant's car. Counsel's closing argument at trial emphasized that Shante's and Thomas' clothing descriptions of the shooter did not match the clothing worn by defendant:

>    "Did you think to yourself, where is that red hoodie that Shante told you about the shooter was wearing? Where is the red hoodie? We don't know. Where is the grey leather jacket that Sergeant Egan told you Fred Thomas said the shooter was wearing? No grey leather jacket. *** The only guy in this entire case wearing anything red is James Jackson. ** [Thomas] says the shooter wore a gray leather jacket. He's wrong. There is no grey leather jacket. His wife says the shooter is in a red hoodie. She's wrong. There is no red hoodie."

¶ 39    Given all this evidence and argument by counsel casting doubt that defendant's clothing matched that of the shooter, we find no deficiency rising to the level of ineffective assistance in

counsel's failure to present additional evidence and argument regarding the color of the coat defendant was wearing. Further, given Shante's and Thomas' identifications of defendant under circumstances permitting a positive identification, in conjunction with the firearm evidence, the result of the trial would not have been different had evidence of the color of defendant's coat been presented. Therefore, defendant's claim of ineffective assistance also fails for lack of prejudice.

¶ 40 Next, defendant contends that the prosecutor made improper remarks during closing argument that deprived him of a fair trial. A prosecutor is allowed wide latitude during closing arguments, and may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Cook*, 2018 IL App (1st) 142134, ¶ 61. On review, we consider the challenged remarks in the context of the record as a whole, in particular the closing arguments of both sides. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). Reversal is warranted only if the prosecutor's improper remarks substantially prejudiced defendant, that is, if they constituted a material factor in his conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 41 Initially, we note that it is unclear whether the proper standard of review for alleged prosecutorial misconduct in closing arguments is *de novo* or abuse of discretion. *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009). We need not resolve this issue because the outcome here is the same under either standard.

¶ 42 First, defendant contends that the State deprived him of a fair trial by referring to him as Peewee. Defendant forfeited review by failing to object. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Forfeiture aside, although general principles of fair play dictate that a nickname that has a pejorative connotation be used sparingly, it is not improper for the prosecutor to refer to defendant by his nickname if witnesses knew and identified him by that name. *People v. Salgado*, 287 Ill.

App. 3d 432, 445 (1997). Thomas testified that he knew defendant by the nickname Peewee. During rebuttal argument, the prosecutor used the nickname to refer to defendant five times, but she did not use it in a mocking or pejorative manner; elsewhere in her argument she referenced defendant by his actual name or as "defendant." We find no reversible error.

¶ 43    Next, defendant contends the prosecutor erred by commenting that Shante "puts herself between her husband and the gunman and she lays on his body while Fred is playing dead, hoping that he's had enough blood sport for that day."  The prosecutor's comment was an accurate reflection of Thomas' testimony that defendant shot him 11 times and that he fell inside his car and was "basically playing dead," and Shante's testimony that she laid on top of Thomas and told defendant to stop shooting. We find no reversible error.

¶ 44    Next, defendant contends that the prosecutor impermissibly commented on the burden of proof by stating:

> "[W]e have the burden beyond a reasonable doubt. We do embrace that burden. But here's the news, that burden is not some special magic burden we came up with today for him.
>
> [Objection by defense overruled.]
>
> And it's a reasonable doubt, not an unreasonable doubt. It's beyond a reasonable doubt. And I won't define for you what reason is—what reasonable is, but you know what it is. You know the difference between something unreasonable and something reasonable."

¶ 45    Neither the trial court nor counsel should attempt to define reasonable doubt for the jury. *People v. Downs*, 2015 IL 117934, ¶ 19. This is because " 'reasonable doubt' is self-defining and needs no further definition." *Id.*

¶ 46    In the present case, the prosecutor specifically "embrace[d]" the reasonable doubt burden and told the jury that it would *not* define reasonable doubt. We find no reversible error.

¶ 47    Defendant also contends that the prosecutor improperly disparaged defense counsel by stating during rebuttal argument:

> "A few minutes ago, the lawyer for Pierre, Peewee, Manning said, put aside the evidence from the car for the time being, put that evidence aside. Well, if I was representing Pierre, Peewee, Manning, I'd want to put the evidence aside too. What I would want to put aside more than anything is the fact that the gun that was found right where the driver sits matches the 11 shell cases that were collected from the gas station. Boy, I'd sure want to put that aside. You don't put anything aside, ladies and gentlemen. You consider everything in this case."

¶ 48    Defendant forfeited review by failing to object to these comments. *Enoch*, 122 Ill. 2d at 186. Forfeiture aside, the prosecutor's comments were in response to defendant's closing argument in which he stated:

> "Put aside for the time being, you know, they find these things in the car, the shells. It really comes down to do you believe Fred and Shante?"

¶ 49    Defendant's argument invited the prosecutor's rebuttal argument refuting the suggestion that the jury should put aside the evidence that the 11 shell cases matched the gun found in defendant's car. We find no reversible error. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) (statements made during the prosecutor's rebuttal argument are not improper where they were provoked or invited by defendant's argument).

¶ 50    Next, defendant argues that by failing to answer "no" to the jury's first question in its note regarding whether he could be convicted simply for being in the getaway car, the court effectively

encouraged the jury to find him guilty of attempted first degree murder based on an accountability theory never argued at trial. Defendant forfeited review by acquiescing to the court's response to the jury note. *People v. Reid*, 136 Ill. 2d 27, 38 (1990). Despite defendant's insistence, plain error review does not apply to this case. Plain error analysis applies to cases of procedural default, not affirmative acquiescence. *People v. Bowens*, 407 Ill .App. 3d 1094, 1101 (2011).

¶ 51    Defendant argues that *People v. Jaimes*, 2019 IL App (1st) 142736, compels a different result. In *Jaimes*, we held that although the defendant there ultimately agreed with the trial court's response to the jury questions, he did not truly acquiesce as he had also actively suggested responses the trial court could take that were different from the one it actually took. *Id.* ¶ 42. Consequently, defendant could invoke plain error review. *Id.*

¶ 52    By contrast, defendant here agreed with the court's response that the jury should continue to deliberate based on the instructions given and he offered no alternative responses. Accordingly, defendant affirmatively acquiesced in the court's response and therefore plain error review is not available. Defendant's challenge may only be brought as a claim that his trial counsel rendered ineffective assistance by not arguing to the court that it should answer the jury's question in the negative. See *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011) (where defendant affirmatively acquiesces to actions taken by the trial court, defendant's only recourse is to make a claim of ineffective assistance). Defendant failed to make such a claim of ineffective assistance.

¶ 53    Even if defendant *had* argued ineffective assistance, our result would be the same. The jury ultimately found that defendant personally discharged the firearm, meaning he was guilty as a principal, and therefore it would have convicted him even if the court had answered "no" to the question regarding whether he could be convicted on an accountability theory. Counsel's failure

to argue that the court should answer the jury's question about accountability in the negative did not prejudice defendant and therefore did not constitute ineffective assistance.

¶ 54    Defendant argues that even if the alleged errors raised on appeal are not sufficient to require reversal individually, they cumulatively operated to deny him due process and a fair trial. We disagree. As none of defendant's allegations of error have merit, they did not individually or cumulatively deprive him of due process and a fair trial.

¶ 55    For all the foregoing reasons, we affirm the circuit court.

¶ 56    Affirmed.