2021 IL App (1st) 181600-U

No. 1-18-1600

Order filed March 31, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 13472 |
| | ) | |
| EARL TRUSS, | ) | Honorable |
| | ) | Tommy Brewer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We decline to reduce defendant's conviction for first-degree murder to second-degree murder based on imperfect self-defense because the trial court reasonably found that defendant had not proven the existence of that mitigating factor by a preponderance of the evidence. We reject defendant's contention that his 56-year sentence is excessive. We decline to address defendant's as-applied challenge to his sentence under the Illinois Constitution's proportionate penalties clause because that claim was not raised below.

¶ 2    In 2015, at the age of 20, defendant Earl Truss shot and killed 17-year-old Juwan Benson

and seriously injured Benson's mother, LaKeisha Coleman, during a confrontation at a gas station

convenience store. After a bench trial, Truss was convicted of first-degree murder and aggravated battery and was sentenced to 56 years in prison. On appeal, Truss asks us to reduce his conviction from first-degree murder to second-degree murder on the ground that he acted with the actual albeit unreasonable belief in the need for self-defense. In addition, he contends that his sentence violates the proportionate penalties clause of the Illinois Constitution and is excessive. For the following reasons, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4                                         A. Trial

¶ 5    On the afternoon of May 30, 2015, Benson and Coleman walked from their home to a nearby gas station in Harvey to buy blunts (cigars for smoking marijuana) from the gas station's convenience store. They were joined by Benson's uncle, Edward McGee, and McGee's girlfriend, Keyairra Garrett. Security camera footage shows the group entering the store at 3:45 p.m.[2] While the others shopped, Benson waited near the door. About 90 seconds later, Coleman and McGee returned to the counter and paid for their items. Benson, Coleman, and McGee then remained in the store and loitered near the door with two other men.

¶ 6    At 3:47 p.m., Truss entered the gas station parking lot on foot. Video footage from an exterior security camera shows Truss walking across the parking lot with his right hand tucked in the upper left side of his jacket. As he approached the store, he turned and looked behind him. About 20 seconds after he entered the parking lot, Truss walked past the door to the convenience

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Video footage from multiple cameras, both inside and outside the store, was introduced at trial and played for the court.

store as Benson, Coleman, and two other men watched him through the glass. Truss then turned and walked toward the store with his right hand still tucked in the left side of his jacket.

¶ 7    As a woman entered the store, Coleman and the other men walked away from the door. Benson remained in front of the full-length window to the right of the door, watching as Truss approached. Coleman testified that Benson said "here come Blue," referring to Truss by his nickname. At 3:47:26, Truss walked up to the window in front of Benson. At 3:47:29, as another man approached to enter the store, Benson stepped to his left and pushed the door open. He then stood in the left side of the doorway, with his arms at his sides, and turned to face Truss, as the other man passed between them to enter the store.

¶ 8    Coleman testified that she saw Truss standing outside the door with his right hand in the left side of his jacket. She did not hear Truss and Benson say anything to each other. She turned around for a moment when someone else in the store called her name, and when she turned back around she saw the butt of Truss's gun. She told Benson not to worry because Truss was "not going to blow that motherf***er" in "broad daylight." Garret testified that she heard Coleman tell Benson to "let it go" and saw Coleman touch Benson's right shoulder. She said that Benson then turned around "like he was finna let it go."

¶ 9    The video footage shows that at 3:47:33 Coleman walked up to Benson and put her hand on his shoulder. Two seconds later, Truss pulled a gun out of his jacket, pointed it at Benson's head, and began to shoot. When the shooting started, Benson's arms were at his sides. Within two seconds, Truss had fired seven shots, striking Benson and Coleman multiple times. He continued shooting even after both had fallen to the floor. He then ran from the scene.

¶ 10    The store cashier called 9-1-1. Police and an ambulance arrived within 10 to 20 minutes. Coleman had been shot in the neck and legs. She was taken to the hospital, where she remained for a month. Benson was shot five times—once in the face, three times in the chest, and once in the arm—and died at the scene. A crime scene investigator who arrived several hours after the shooting searched Benson's pockets and clothing and found no weapon.

¶ 11    Coleman and Garrett both testified that they did not see Benson with a gun that day. Coleman testified that Benson previously kept a handgun and rifle at her grandmother's house but the police confiscated the weapons about a year earlier. She also testified that Benson once held a gun during an argument with her.

¶ 12    Truss acknowledged that he shot Benson and Coleman but claimed that he did so in self-defense. He testified that he had known Benson for several years and had been involved in prior arguments with him at the gas station. Truss testified that he had recently come out on the losing end of two fist fights with Benson and his friends at the gas station. He also alluded to an incident with Benson at the gas station the day before the shooting but he did not elaborate. Truss also testified that he had seen Benson with a gun multiple times and identified several pictures of Benson holding guns that he had seen posted on social media prior to the date of the shooting.

¶ 13    Truss testified that, on the day of the shooting, he was at a friend's house about a block away from the gas station. There was a shooting in front of the house next door and his friend's house had also been hit. Shortly after that shooting, Truss testified, he decided to go to the gas station to buy cigarettes, blunts, and food. He testified that he brought a gun with him because Harvey is a "rough area" and he was scared of Benson and his friends, although he claimed not to know that Benson would be there at the time. He explained that he held his right hand inside his

jacket to conceal his gun and looked behind him as he walked through the parking lot to see if any police were in the area.

¶ 14 Truss testified that, when he arrived at the gas station, Benson blocked him from entering the convenience store and told him that "he got my b*** ass" and "was going to catch me up there." Truss testified that he did not leave when he saw Benson because he thought Benson had a gun and would shoot him in the back, although he conceded he did not see Benson with a gun that day. Truss testified that, when Coleman approached and "grab[bed]" Benson, it caused the right side of Benson's body to "jerk back" and caused Benson's right hand to move toward the back of his waist. Truss testified that he thought Benson was reaching for a gun, so he decided to shoot Benson before Benson could shoot him. He fired six or seven shots in quick succession and then ran away.

¶ 15 Truss presented testimony from two other witnesses. Christopher Robinson testified that Benson and an older male robbed him in 2012. Robinson testified that the older male held a gun to his head while Benson took his camera. At Truss's request, the court took judicial notice of Benson's 2012 juvenile adjudication for robbery. The other witness, Elijah Porter, testified that about a week before the gas station shooting, Benson and two other men drove by in a car and shot at him, Truss, and a few other people.

¶ 16 Following closing argument, the trial court found Truss guilty of first-degree murder and aggravated battery and acquitted him of attempted murder with respect to Coleman. Discussing Truss's self-defense claim, the court remarked that the surveillance footage "speaks for itself." The court noted that the video showed Truss drawing his gun and firing while Benson's hands were at his sides and "not up in attack mode or reaching as if he was reaching for a weapon."

The court also explained that when Truss approached the store with his hand inside his jacket and looked around for police, it indicated that his purpose in approaching the store was to harm Benson.

¶ 17                                                  B. Sentencing

¶ 18    At the sentencing hearing, the State called Julie Willis, an assistant public defender, as a witness in aggravation. Willis testified that she was meeting with a client at the courthouse lockup in 2017 when Truss, who was being held in the same area, exposed himself and masturbated. When Willis told her client that she had to end the conversation due to Truss's indecency, Truss called her "a lying b***." The State also called Benson's grandmother, Shirley Coleman, who read from her victim impact statement.

¶ 19    Truss called three relatives as witnesses in mitigation. His aunt, Ebony Scott, testified that he was loving, helpful, and attentive. She also testified that she was prepared to offer Truss support and encouragement and could employ him at her trucking company. Truss's uncle, David Rogers, a pastor and former Chicago police officer, testified that Truss was "a great kid" who had not been in trouble before and was capable of redemption. Finally, Truss's mother, Shena Brooks, testified that Truss was "a good kid" who was funny and had not caused her "serious issues." She talked about the difficulty Truss faced growing up as the only boy with three sisters. She apologized to Benson's family on Truss's behalf for the loss of their son and asked the court not to take away her son as well with a life sentence.

¶ 20    The trial court also considered a presentence investigation (PSI) report. The PSI indicated that Truss was born in October 1994, making him 20 years and 7 months of age at the time of the offenses. The PSI also documented that Truss had no criminal history as an adult or juvenile. Based on Truss's reporting, the PSI stated that Truss had a "normal childhood" and a "good" or "normal"

relationship with his parents and siblings. He reported being expelled from high school during his sophomore year for fighting and attending an alternative school for a year before quitting. He also reported working as a part-time UPS driver for five months in 2013 and at a few short-term jobs before that. Prior to his incarceration, he lived with and was supported by his mother.

¶ 21     After discussing his own history growing up amid rampant gang violence in Chicago and lamenting the senselessness of Truss's actions, the trial judge sentenced Truss to consecutive terms of 50 years in prison for the first-degree murder conviction (including a 25-year enhancement for personally discharging a firearm that proximately caused Benson's death) and six years in prison for the aggravated battery conviction. Truss moved to reconsider the sentence, arguing that it was excessive in light of his background and the nature of the offenses. In denying the motion, the trial court indicated that it had considered the evidence in aggravation and mitigation as well as the PSI when determining the sentence. Truss then filed a timely notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23                           A. Sufficiency of the Evidence

¶ 24     Truss's first contention is that his conviction for first-degree murder should be reduced to second-degree murder because the evidence supports a finding that he acted with the actual, albeit unreasonable, belief in the need to use deadly force in self-defense against Benson.

¶ 25     In Illinois, the offense of second-degree murder is a lesser mitigated offense of first-degree murder. *People v. Manning*, 2018 IL 122081, ¶ 18. If the State proves beyond a reasonable doubt that a defendant committed first-degree murder, the defendant may reduce the offense to second-degree murder by proving the existence of a mitigating factor by a preponderance of the evidence. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 154; 720 ILCS 5/9-2(c) (West 2014). One such

mitigating factor—known as imperfect self-defense—is that "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles [of self-defense], but [the defendant's] belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014). This mitigating factor is established "when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995).

¶ 26    "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2014). There are six elements to a claim of self-defense: "(1) force [was] threatened against a person, (2) the person [was] not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35. To secure a conviction for first-degree murder over a defendant's claim of self-defense, the State must prove beyond a reasonable doubt that at least one of the above factors does not apply. *Jeffries*, 164 Ill. 2d at 128. However, when a defendant seeks to mitigate an offense from first-degree murder to second-degree murder, he bears the burden of proving the first five elements of self-defense by a preponderance of the evidence. *Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 27    When considering whether the evidence justifies a reduction of a defendant's conviction from first-degree murder to second-degree murder, we apply a modified version of the standard of review governing sufficiency of the evidence claims. Under the standard of review applicable to a traditional sufficiency of the evidence argument, we view the evidence in the light most favorable

to the State and ask whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. Here, Truss does not contest that the evidence was sufficient to prove him guilty of first-degree murder. He argues only that the evidence also established the existence of the mitigating factor of imperfect self-defense, warranting the reduction of his conviction to second-degree murder. Because Truss bore the burden of proving the existence of the mitigating factor of imperfect self-defense, our standard of review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factor was not established. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). As when reviewing any challenge to the sufficiency of the evidence, we defer to the finder of fact "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts" and "will not substitute [our] judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 28    Applying these standards, we find no basis for reducing Truss's conviction to second-degree murder. After viewing the video evidence, we agree with the trial court's assessment that the footage speaks for itself and rebuts Truss's assertion that he subjectively believed the use of force against Benson was necessary for self-defense. As the trial court explained, the video shows Truss drawing his gun and firing at Benson while Benson's arms were at his sides. And contrary to Truss's assertion that Benson made a jerking motion when Coleman touched his shoulder that led Truss to believe that Benson was reaching for a weapon, the video demonstrates that it was Truss's act of drawing his gun and pointing it at Benson, and not Coleman's contact with Benson, that caused Benson's movement.

¶ 29    Additional portions of the video evidence lend further support to the trial court's finding that Truss was acting as the aggressor and not based on a subjective belief in the need for self-defense. Footage from the store's exterior camera shows Truss approaching the store just seconds before the shooting with his right hand tucked in the upper left side of his jacket—both concealing his gun and allowing him to readily access it—and looking behind him to see who else was present. Moreover, the footage from the interior cameras show Truss firing multiple shots at Benson even after both he and Coleman had fallen to the ground and then immediately fleeing from the scene. Viewing this evidence in the light most favorable to the State, the trial court reasonably concluded that Truss did not act with a subjective belief in the need for self-defense.

¶ 30    Truss relies on *People v. Hawkins*, 296 Ill. App. 3d 830 (1998), where this court reduced a conviction from first-degree murder to second-degree murder based on a claim of imperfect self-defense. But in *Hawkins*, the deceased punched the defendant in the head, threw a brick at him, and then moved toward him while threatening to kill him. *Id.* at 838. When the defendant pulled out a knife and tried to escape, the deceased blocked his way, grabbed him, and swung at him with a closed fist. *Id.* Here, Truss testified that Benson blocked him from entering the store and told him "he got my b*** ass" and "was going to catch me up there." But Benson did not block Truss's means of *retreating* from the confrontation, as occurred in *Hawkins*. And contrary to Truss's claim that Benson threatened him prior to the shooting, Coleman testified that she did not hear any conversation between Truss and Benson. The trial court was free to reject Truss's testimony that Benson threatened him when faced with conflicting evidence.[3] Regardless, the video evidence

---

[3] Truss also argues that Benson told Truss to "come here." But Coleman's testimony was that she heard Benson say "here come Blue," referring to Truss by his nickname.

establishes that, unlike in *Hawkins*, any threats by Benson were not accompanied by acts of violence.

¶ 31    Finally, Truss testified that Benson had beaten him up on prior occasions and introduced evidence that Benson often carried a gun. But there was no evidence that Benson brandished a gun during their prior altercations or that Benson was armed on the day of the shooting. And the critical facts here, as captured in the video footage, are that Truss walked to the store concealing a firearm to which he had ready access and fired multiple shots at Benson while Benson's arms were at his sides. He continued to fire even after both Benson and Coleman had fallen to the ground. Viewing the evidence in the light most favorable to the State, a rational factfinder could conclude that Truss's actions "point[ed] more toward retribution and not in any belief in self-defense or defense of others, reasonable or unreasonable." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 88. Accordingly, there is no basis for reducing Truss's conviction to second-degree murder.

¶ 32                                    B. Sentencing Issues

¶ 33                            1. Proportionate Penalties Clause

¶ 34    Truss also raises two challenges to his sentence. His first contention is that his 56-year, *de facto* life sentence violates the Illinois Constitution's proportionate penalties clause, as applied to him, because it was imposed without adequate consideration of his age and various age-related characteristics. Our state constitution's proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates this provision if it is "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Sharpe*,

216 Ill. 2d 481, 487 (2005). Whether a sentence violates the proportionate penalties clause is a question of law that we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 35    Truss relies on the United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012), and *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 733-34 (2016), which held that the Eighth Amendment prohibits the imposition of a life sentence on a juvenile offender unless the sentencing court first considers the offender's youth and its attendant characteristics and determines that he or she is one of the rare juvenile offenders who may be deemed permanently incorrigible rather than merely transiently immature. See *People v. Holman*, 2017 IL 120655, ¶ 46. This rule rests on the principle that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. The Court has explained that "the distinctive attributes of youth"—including "immaturity, recklessness, and impetuosity," as well as a juvenile's "capacity for change"—"diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472-73. Our supreme court has held that the rule of *Miller* and *Montgomery* applies not only to actual life sentences but also to *de facto* life sentences, which it defines as any sentence of more than 40 years in prison. *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 36    Truss acknowledges that he was not a juvenile at the time he committed his offenses, but he argues that the principles of *Miller* and *Montgomery* should be applied to young adults, such as himself, under the Illinois Constitution's proportionate penalties clause based on what he asserts is an emerging scientific understanding that youth brain development continues into a person's mid-twenties. However, while our supreme court has left open the possibility that the proportionate

penalties clause may provide such protections to young adult offenders, it has stressed that such as-applied constitutional claims can only be resolved on an adequate factual record.

¶ 37 In *People v. Harris*, 2018 IL 121932, a young adult on direct appeal raised an as-applied proportionate penalties clause challenge to his *de facto* life sentence. In declining to address the claim, the court explained that as-applied constitutional challenges "are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶ 39. As such, the supreme court explained, "[a] court is not capable of making an as-applied determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact" relevant to the claim. (Internal quotation marks omitted.) *Id.* Because the defendant had not raised his as-applied proportionate penalties clause challenge in the trial court and had thus failed to develop a sufficient factual record in support of the claim, the court held that it would be premature to resolve the claim on direct appeal. *Id.* ¶¶ 40-41, 46.

¶ 38 Like the defendant in *Harris*, Truss did not advance a proportionate penalties clause argument in the trial court. Yet he contends that the record is sufficient to resolve his challenge on direct appeal because it includes information about his age and the circumstances of the shooting that demonstrate his youthful impulsiveness. But our supreme court rejected an identical argument in *Harris*. As the court explained there, the record must include not only "basic information about [the] defendant," but also "evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to [the] defendant's specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46.

¶ 39 As in *Harris*, here no such evidence was presented to the trial court and that court made no "findings on the critical facts needed to determine whether *Miller* applies to [Truss] as an adult."

*Id.* Under such circumstances, as *Harris* explained, an as-applied proportionate penalties clause challenge premised on an extension of *Miller*'s rationale to young adults must be raised in a postconviction proceeding, where an adequate record in support of the claim may be developed and factual findings relevant to the claim may be made. *Id.* ¶ 48; see also *People v. Vega*, 2018 IL App (1st) 160619, ¶¶ 48-58 (declining to address similar as-applied proportionate penalties clause claim in light of *Harris*). This court's decision in *People v. House*, 2019 IL App (1st) 110580-B, is not to the contrary, as that case involved an as-applied challenge raised on postconviction review rather than direct appeal. *Id.* ¶ 32 (distinguishing *Harris* on that basis).

¶ 40    For the same reason, it would be inappropriate to consider in this posture Truss's related claims that his trial counsel was ineffective for failing to raise a proportionate penalties clause challenge in the trial court or that the trial court's alleged failure to sentence him in accord with the principles of *Miller* constitutes plain error under the proportionate penalties clause. To prevail on his ineffective assistance claim, Truss must show a reasonable probability of succeeding on an as-applied proportionate penalties clause challenge to his sentence premised on an extension of the rationale of *Miller* to his circumstances. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (holding that to demonstrate prejudice on an ineffective assistance claim, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[4] And to establish that his sentence amounts to plain error under the proportionate penalties clause, Truss would similarly have to demonstrate that the

---

[4] Contrary to Truss's contention, we may not presume prejudice in these circumstances because Truss's counsel did not "entirely fail[ ] to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Rather, counsel presented several witnesses in mitigation at the sentencing hearing, argued that the court should not apply the 25-year firearm enhancement, and urged the court to consider Truss's lack of criminal history and family support when imposing his sentence.

principles of *Miller* apply to him under the proportionate penalties clause. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (noting that "the first step" in a plain error analysis is to determine whether there was error). The same inadequacies in the record that make it impossible for us to resolve Truss's underlying as-applied proportionate penalties clause challenge likewise prevent us from resolving these related contentions, which would also be more appropriately raised and considered on postconviction review. See *Harris*, 2018 IL 121932, ¶ 48 (noting that ineffective assistance claims "are commonly raised in postconviction proceedings because they often require presentation of evidence not contained in the record").

¶ 41                                    2. Excessiveness

¶ 42    Finally, Truss contends that his sentence is excessive. We consider this claim under an abuse of discretion standard. See *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) ("The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference.").

¶ 43    As noted above, the Illinois Constitution mandates that all sentences "shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Accordingly, when fashioning a sentence, a trial court must consider all relevant factors in aggravation and mitigation, including, among other things, the defendant's age, demeanor, habits, mentality, criminal history, moral character, social environment, and education, as well as the nature and circumstances of the offense and the defendant's role in it. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). A trial court is better positioned than an appellate court to determine an appropriate sentence based on its first-hand consideration of these factors. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). We will thus not substitute

our judgment for that of the trial court simply because we may have weighed the various factors differently. *People v. Stacy*, 193 Il. 2d 203, 209 (2000). Instead, "[a] sentence within [the] statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 44    Truss's aggregate 56-year sentence falls well within the statutory sentencing range for his offenses. For his first-degree murder conviction, the sentencing range was 20 to 60 years for the base offense, with an added 25 years to life based on the trial court's finding that Truss personally discharged a firearm in the commission of the offense that proximately caused great bodily harm or death. See 730 ILCS 5/5-4.5-20(a) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014). And the sentencing range for his aggravated battery conviction was six to 30 years. See 720 ILCS 5/12-3.05(e)(1), (h) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). In addition, the trial court was required to impose consecutive sentences for these offenses. See 730 ILCS 5/5-8-4(d)(1) (West 2014). Truss therefore faced an aggregate sentencing of range of 51 years to life.

¶ 45    Truss's 56-year aggregate sentence falls at the low end of the applicable sentencing range and is not "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54. Truss's offenses were extremely serious. The evidence at trial indicated that he acted with premeditation and a desire for revenge rather than due to impulsiveness or a perceived need for self-defense. He opened fire in an occupied convenience store, not only killing Benson but also seriously injuring Coleman. His actions also presented a serious risk of harm to other individuals in the store. Despite his potential for rehabilitation, we cannot say that the court abused its discretion in imposing a sentence just five

years above the mandatory minimum based on the severity of the offenses. See *Alexander*, 239 Ill. 2d at 214 ("[a] defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense").

¶ 46    Truss argues that the trial court failed to adequately consider his age and its attendant characteristics as well as his prospects for rehabilitation. But the court had before it a PSI that documented Truss's age and provided relevant details about his background, including his lack of criminal history and his family, educational, and employment histories. The court also heard testimony from three of Truss's relatives, who spoke of his good qualities and the support they could provide him upon his release from prison. The trial court noted that it had considered the evidence in aggravation and mitigation and the PSI when determining Truss's sentence. Although the court did not expressly discuss Truss's age or explain its assessment of other relevant factors, it was "not required to list the particular reasons" for its sentence. *Vega*, 2018 IL App (1st) 160619, ¶ 66. Rather, "[w]here mitigating evidence is presented to the trial court, it is presumed, absent some indication to the contrary, other than the sentence itself, that the court considered it." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. Here, Truss offers no reason to think that the court ignored any of the mitigating evidence that was presented.

¶ 47    Finally, Truss appears to argue that his trial counsel was ineffective for failing to raise an excessiveness argument in the trial court. But counsel made that argument in a motion to reconsider Truss's sentence, arguing that the 56-year sentence was excessive in light of Truss's background and the nature of his offenses. While the argument was presented in a bare-bones fashion, it sufficed to preserve the issue for our review. Moreover, in light of the seriousness of Truss's offenses and the court's imposition of a sentence near the low end of the sentencing range, there

is no reasonable probability that Truss would have received a lower sentence if counsel had more forcefully presented an excessiveness argument. Accordingly, because Truss was not prejudiced by any deficiency in trial counsel's performance, this ineffective assistance claim fails. *Strickland*, 466 U.S. at 694.

¶ 48                                III. CONCLUSION

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.