2021 IL App (1st) 192468-U

No. 1-19-2468

Order filed September 14, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 11118 |
| | ) | |
| JAYME DORDIES, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The judgment of the circuit court is affirmed over defendant's claims of ineffective assistance of counsel and excessive sentence.

¶ 2    Following a bench trial, defendant Jayme Dordies was found guilty of armed habitual criminal and sentenced to 10 years' imprisonment.[1] On appeal, he alleges that his trial counsel was ineffective for failing to file a motion to suppress statements defendant made at the time of his

_____

[1] The indictment shows defendant is also known as James Scott.

arrest, and for withdrawing a motion to suppress statements defendant made during his interrogation. Defendant also alleges that his sentence is excessive in light of the nature of the offense and the mitigating factors presented at sentencing. We affirm.

¶ 3    Defendant was charged by indictment with one count of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)) and two counts of unlawful use or possession of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2018)) premised on his possession of a firearm and ammunition while being a convicted felon. He was also charged with four counts of aggravated UUW premised on his carrying a firearm without a valid firearm owner's identification (FOID) card or concealed carry license (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C); (a)(2), (a)(3)(A-5); (a)(2), (a)(3)(C) (West 2018)). The charges arose from an incident in Chicago on July 18, 2018.

¶ 4    Prior to trial, defendant filed a motion to suppress statements and then an amended motion to suppress statements he made during an interrogation at "Area" by law enforcement officials. Defendant alleged he was interrogated without being read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). He further claimed his statements were "not made voluntarily, knowingly and intelligently in violation of the 5th & 14th Amendments" due to his physical, physiological, and mental state. More specifically, he asserted his statements were made involuntarily because, *inter alia*, he suffered from prostate issues, was repeatedly denied leave to use the bathroom, and was told he could not use the bathroom until he answered the detectives' questions. On August 7, 2019, at a court hearing held in defendant's presence, defendant's trial counsel told the court, "I did speak to my client yesterday and after lengthy conversation we are withdrawing our motion to suppress statements."

¶ 5     At trial, Chicago police officer Victor Ramiriz testified that on July 8, 2018,[2] at about 10:15 a.m., he was on patrol with his partner Officer Jose Hernandez, in an unmarked vehicle and in uniform, at the intersection of 72nd Street and Bennett Avenue. Ramiriz heard about three rounds of a handgun being fired, and then heard another set of about three rounds. At the southeast corner of the intersection, Ramiriz saw a man, whom he identified in court as defendant, holding a handgun in his right hand and aiming it westward. Ramirez observed one flash coming from the handgun as it fired.

¶ 6     Ramiriz and Hernandez chased defendant, who ran eastbound on the south sidewalk of 72nd Street with the handgun still in his right hand. After running about 15 or 20 feet, defendant tossed the handgun behind him on the ground. While Hernandez continued to chase defendant, Ramiriz recovered the handgun, observed that it was a semi-automatic 9-millimeter handgun, and took it back to the squad vehicle. He then found Hernandez with defendant in the backyard of a nearby house. Ramiriz inventoried the handgun.

¶ 7     On cross-examination, Ramiriz confirmed that the weather that day was clear. Ramiriz could not tell what defendant was shooting at because the incident occurred in a residential area and there were multiple people on the street. Defendant made eye contact with Ramiriz when he started running. On redirect examination, Ramiriz stated that after defendant tossed the handgun, he raised his arms as he ran, and there was a white towel in defendant's right hand.

---

[2] We note that throughout the direct examination of its various witnesses, the State inconsistently referred to the date of the offense as July 8, 2017, July 8, 2018, and July 18, 2018, though defendant's indictment and other documents in the common law record consistently reflect that the offense took place on July 18, 2018. Nonetheless, the correct date of the offense is not relevant to our disposition of the issues on appeal, and the parties do not dispute that the State's witnesses all testified regarding the same events, regardless of which of the three dates the offense occurred on.

¶ 8     Hernandez testified consistently with Ramiriz, but added that he saw smoke and at least two shots emitted from defendant's handgun. During the chase, defendant extended his arms out and held "something like a white towel." Hernandez arrested defendant in a backyard and asked defendant "a few questions," though Hernandez could not recall the questions. Defendant told Hernandez he "was shooting back" and "protecting himself." Hernandez performed a pat-down and found "nothing threatening" on defendant. Hernandez confirmed that the chase was captured on his body camera.

¶ 9     On cross-examination, Hernandez testified that defendant was standing while he shot the handgun and then ran once Hernandez and Ramiriz approached. Hernandez never lost sight of defendant during the chase. Defendant was handcuffed and on the ground when Hernandez asked him questions. Hernandez asked whether defendant "had anything else on him" because his "main concern was safety or if there was a second weapon." When Hernandez patted defendant down, he did not find anything other than a white towel, which was recovered and inventoried.

¶ 10     Chicago police detective James Mansell testified that he went to the scene of the shooting that day and recovered six spent 9-millimeter casings. He also saw a bullet hole in a vehicle. The State entered into evidence photographs taken by Mansell, which depicted crime scene markers near where the shell casings were recovered and the vehicle with the bullet hole.

¶ 11     At about 1:58 p.m., Mansell Mirandized defendant in the police station's lockup in the presence of Detective Brazell.[3] Defendant then agreed to speak with Mansell. Defendant told Mansell that a man at the scene told defendant "he was going to beat his a*** and I got something for you" and drove away. The man returned and fired "several" bullets at defendant. Defendant

---

[3] The first name of Detective Brazell does not appear in the transcript of the trial proceedings.

fired two bullets at the man and then ran away when the police arrived. Defendant told Mansell he threw his firearm over a fence because he was "not supposed to have a gun."

¶ 12    On cross-examination, Mansell confirmed that he interviewed other people on the scene. Mansell took defendant's statement about four hours after defendant's arrest. Mansell was not aware that defendant asked multiple times to use the restroom at the police station, and he did not recall defendant stating he had a medical condition requiring him to use the restroom. Mansell also did not recall telling defendant that he could only use the restroom after agreeing to a gunshot residue kit. Mansell testified that the interview lasted about 15 or 20 minutes.

¶ 13    The Stated entered into evidence video footage captured that day by the body cameras of Ramiriz and Hernandez respectively. The parties stipulated that the footage was a true and accurate depiction of the observations of the camera on the day of the incident. The videos were played for the court. We have viewed the video evidence included in the record on appeal, including footage from the body camera of Hernandez. In this video, Hernandez chases defendant into the backyard of a house, and defendant runs onto a balcony behind the house and jumps over the balcony. Defendant lies on the ground on his stomach, and Hernandez catches up to defendant and cuffs his hands behind his back. Hernandez asks defendant, "You got anything else on you?" Defendant states, "No, sir." Hernandez then exclaims, "What's up with you?" Defendant responds, "He shot at me. I was protecting myself." The State also submitted stipulated certificates of conviction showing that defendant pleaded guilty to burglary in 1990 and was convicted of unlawful use of a weapon (UUW) in a 1997 case.

¶ 14    The defense entered a stipulation that, if called to testify, Illinois state police forensic scientist Ellen Chapman would state that the gunshot residue kit administered to defendant

indicated that defendant "may not have discharged a firearm with his right or left hands." Chapman would further state if defendant did discharge a firearm, "the particles were not deposited, removed [by] activity and were not detected by the procedure."

¶ 15    The trial court found defendant guilty of the armed habitual criminal count and two UUWF counts, and not guilty of the four aggravated UUW counts. The court merged the two UUWF counts into the armed habitual criminal count. The court found that the State's witnesses were "clear," "consistent," "credible," and corroborated by one another and the video evidence. The court additionally found that the lack of gunshot residue did not raise any doubt as to the credibility of the State's witnesses. The court noted that, given the chase that occurred during a hot time of year and the towel defendant held during the chase, there was "ample opportunity for the gunshot residue to either be wiped off or come off through environmental factors." The court also observed that both officers saw defendant shoot a weapon, a weapon was recovered "right away," and the officers arrested defendant without losing sight of him.

¶ 16    Defendant filed a motion for new trial, which the trial court denied.

¶ 17    At sentencing, the amended presentence investigation report (PSI) stated that defendant had previously received convictions for burglary and delivery of a controlled substance in 1990, possession of a controlled substance in 1991, delivery of a controlled substance in 1993, UUW without a valid FOID card and UUWF in 1997, misdemeanor domestic battery in 2000, possession of a controlled substance in 2003, domestic battery in 2006, and possession of a firearm with a defaced serial number in 2009. Defendant was sentenced to terms ranging from probation to seven years in prison.

¶ 18    The PSI showed that defendant never had "regular contact" with his father, was "always close" with his mother, and his mother had eight other children. Defendant reported having a " 'bad' " childhood, as "they were poor," "things were difficult," his mother was an alcoholic, and his "basic needs were not met on a regular basis." Defendant's mother physically abused him, and there was "almost an episode of sexual abuse" from someone outside the family when defendant was seven. Defendant stopped attending school in ninth grade. He was "always in special education classes," believed he had a learning disability, and was unable to read or write. Defendant did not have "regular employment" most of his life, and was supported by monthly social security disability payments and "Link benefits." Defendant reported he planned on obtaining a GED in the future.

¶ 19    At the age of three, defendant was hit by a vehicle and "has had a plate in his head since then." Defendant had high blood pressure and was on medication for "tremors." He was not diagnosed with a behavior disorder, but saw a "mental health professional" in the 1980s when applying to obtain disability benefits. Defendant reported he "never had an issue with alcohol," and used cannabis from age 12 until his incarceration. Defendant took "no pride in any criminal behavior," had "no real concern for other people's problems," and "sometimes lacks control over events in his life, since the death of his mother."

¶ 20    The State argued in aggravation that defendant "intentionally possessed a firearm having two or more qualifying felonies," and admitted to discharging it at someone who threatened to fight him. The State cited defendant's criminal history and stated that defendant had used five other aliases throughout his "career" of criminal activity. The State concluded that defendant "has

no respect for the law" or for "individuals," and requested "a significant amount of time based on the fact that this will be his third felony conviction" related to firearms.

¶ 21    Defense counsel argued in mitigation that there was no testimony connecting the bullet hole in the vehicle at the scene with the firearm defendant "alleged[ly]" had. Further, "there was some evidence that [defendant] was shot at, and that's why he returned fired." Defense counsel noted that defendant's last felony conviction was in 2009, and he had not been "involved with the court system for a significant amount of time." Counsel also noted that defendant's mother was an alcoholic and his father was "not really in his life." Defendant had a learning disability and was "still trying to get himself better" and "actually learning how to write and read." Defendant further had "significant trauma in his life," including "possible sexual abuse." Defense counsel therefore requested that the court impose the minimum sentence.

¶ 22    The court confirmed with defendant that he was 48 years old, he had received disability benefits since he was 12, a plate was inserted in his head at age 3, and he was shot in 1998.

¶ 23    The trial court imposed a sentence of 10 years' imprisonment for armed habitual criminal. The court stated that it considered the PSI, the facts of the case, and the arguments in aggravation and mitigation. The court agreed with defense counsel that defendant's life "has not been easy," and that he had had "significant difficulties" in his childhood. Nonetheless, the court noted that defendant had a prior criminal history spanning 30 years, and that "from pretty much the age of 18," defendant was "getting convicted of *** burglary, delivery, possession, *** [and] having a gun." The court told defendant, "It seems that you go in and out of the Department of Corrections," but also noted that defendant's frequency of convictions decreased as defendant grew older.

¶ 24      The court then recounted that in the instant case, defendant was "shooting on the street at God knows who," and the officers caught him and recovered a firearm that, based on his criminal history, he "should never even have on [his] person." The court found the minimum sentence was therefore not appropriate. It told defendant, "It seems that when you're in custody, that's when you do good things. When you're out *** it doesn't seem that you want to *** further your education, try to get a GED, try to learn and read and write, try to take advantage of programs while you're on probation."

¶ 25      On appeal, defendant first alleges that his trial counsel was ineffective for failing to move to suppress his statements that he made to Officer Hernandez immediately following his arrest, in which Hernandez asked him questions without Mirandizing defendant, and defendant stated that he was "shooting back" and "protecting himself." Defendant also alleges that his trial counsel was ineffective for withdrawing his motion to suppress the statements defendant made in the police station, in which he admitted to discharging a firearm at someone. The State responds that regardless of whether any *Miranda* violations occurred, defendant suffered no prejudice where the evidence against defendant was overwhelming, and the trial court did not rely on defendant's statements to find him guilty.

¶ 26      Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant is guaranteed the right to effective assistance of counsel. *People v. Cole*, 2017 IL 120997, ¶ 22. To succeed on an ineffective assistance claim, a defendant must establish that (1) "counsel's performance was objectively unreasonable under prevailing professional norms," and (2) defendant was thereby prejudiced. *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). To establish prejudice, the defendant must show "there

is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 27    Defendant's ineffective assistance claim is based on counsel's failure to file a motion to suppress his arrest and interrogation statements. Under the performance prong of an ineffective assistance of counsel claim, counsel's decision not to file a motion to suppress is typically a matter of trial strategy entitled to great deference. *People v. Mayberry*, 2020 IL App (1st) 181806, ¶ 47. To establish prejudice under the second prong, the defendant must show both "that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 28    While a defendant must satisfy both prongs of the *Strickland* test (*People v. Jackson*, 2020 IL 124112, ¶ 90), we may resolve an ineffective assistance claim based on the prejudice prong without considering whether counsel's performance was deficient (*People v. Pulliam*, 206 Ill. 2d 218, 249 (2002)). Proceeding directly to the prejudice prong, we find defendant has not demonstrated a reasonable probability that the trial outcome would have been different had his counsel filed a motion to suppress and the statements been suppressed.

¶ 29    Defendant was convicted of armed habitual criminal. As charged, "[a] person commits the offense of being an armed habitual criminal if he *** possesses *** any firearm after having been convicted a total of 2 or more times of any combination of" a "forcible felony" or UUWF. 720 ILCS 5/24-1.7(a)(1), (2) (West 2018). "Forcible felony" under the Criminal Code of 2012 is defined as including the offense of burglary. 720 ILCS 5/2-8 (West 2018).

¶ 30 The trial testimony showed that Officers Hernandez and Ramirez saw defendant discharge a firearm and then run when the officers approached him. The officers saw defendant throw the firearm as he ran, and Hernandez never broke sight of him up until he arrested defendant. Ramirez recovered the 9-millimeter firearm from where he saw defendant throw it, and spent 9-millimeter shell casings were recovered from the scene. The officers' testimony regarding the chase was corroborated by the bodycam footage. The trial court found the officers credible, and we defer to that determination. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). Thus, the officers' testimony that they saw defendant shooting and discarding a firearm is ample to demonstrate defendant was in possession of a firearm as charged. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (the positive, credible testimony of a single witness is sufficient to support a conviction).

¶ 31 The State's certificates of conviction, to which defendant stipulated, demonstrate defendant was convicted of burglary in 1990 and UUW in 1997, which are qualifying prior convictions for the armed habitual criminal offense. See 720 ILCS 5/24-1.7(a)(2) (West 2018); 720 ILCS 5/2-8 (West 2018). Accordingly, even without defendant's inculpatory statements, the evidence against him was overwhelming. There is no reasonable probability that the outcome of trial would have been different had the statements been suppressed. Therefore, defendant cannot establish that he was prejudiced by counsel's failure to bring a motion to suppress. See *Henderson*, 2013 IL 114040, ¶ 15.

¶ 32 Defendant argues it is not possible to be confident that the trial court would have found him guilty had it not heard his confession made upon arrest and his statement at the police station. We disagree. The trial court explained its finding of guilt in great detail and never once mentioned the statements defendant made when he was arrested or interviewed at the police station. Rather,

the court focused on the fact that police officers had observed defendant commit the offense and arrested defendant without ever breaking sight of him. Therefore, even if defendant's statements should have been suppressed, the record does not show that the court relied on them to the extent that admission of the statements affected the outcome of defendant's trial at all.

¶ 33 Defendant has failed to demonstrate a reasonable probability exists that the trial outcome would have been different had his counsel successfully moved to suppress his statements both at the time of his arrest and at the police station. *Henderson*, 2013 IL 114040, ¶ 15. As such, defendant's ineffective assistance claim must fail, as defendant cannot show that he was prejudiced by his attorney's withdrawal of his motion to suppress. *Pulliam*, 206 Ill. 2d at 249 (this court can resolve an ineffective assistance claim based on the prejudice prong alone without considering whether counsel's performance was deficient).

¶ 34 Defendant also argues that his 10-year sentence is excessive in light of the nature of his offense, his age, mental health, educational background, and rehabilitative potential. The State responds that the trial court did not abuse its discretion in imposing a 10-year sentence, where the record showed that the trial court thoroughly considered all of the factors in mitigation and aggravation, including defendant's extensive criminal history and the seriousness of his offense.

¶ 35 When sentencing a defendant, a trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. "[T]he trial court has broad discretionary powers in imposing a sentence," and its "sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A reviewing court has the power to disturb the sentence "only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill.

2d 367, 373-74 (1995). A sentence is an abuse of discretion where it is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) (quoting *Stacey*, 193 Ill. 2d at 210). When a sentence falls within statutory guidelines, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 36　Defendant was convicted of armed habitual criminal, which is classified as a Class X felony (720 ILCS 5/24-1.7(b) (West 2018)) and therefore subject to a sentence of 6 to 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2018)). Defendant received a sentence of 10 years, which was within the lower portion of the applicable sentence range, and so we presume his sentence was proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 37　We also presume the trial court considered all of the relevant mitigating factors. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51. The record supports this conclusion. At the sentencing hearing, the trial court had received defendant's PSI, and we presume the trial court considered the mitigating evidence regarding defendant's criminal, educational, employment, physical, psychological, and family histories in it. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 20. Further, defendant raised many of the same arguments at the sentencing hearing as he does on appeal. Thus, the trial court not only read the mitigating evidence in the PSI but heard the mitigating evidence argued as well, and it is presumed to have considered it. See *id.* ¶ 19.

¶ 38　In fact, the trial court specifically stated that it considered the PSI, facts of the case, and arguments in aggravation and mitigation. The court sought to clarify certain factors with defendant, confirming that defendant was 48 years old at the time of sentencing and had received disability benefits since age 12, and noted the "significant difficulties" in defendant's childhood. Thus,

defendant has failed to affirmatively establish the trial court disregarded any mitigating evidence. See *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 39   Further, we do not find defendant's sentence was greatly at variance with the law or manifestly disproportionate to the offense. See *Alexander*, 239 Ill. 2d at 212. As the court observed, defendant had received multiple convictions over the span of 30 years and frequently went "in and out" of prison. See *People v. Lee*, 397 Ill. App. 3d 1067, 1070 (2010) ("Recidivism is a traditional, if not the most traditional, basis for *** increasing an offender's sentence." (Internal quotation marks omitted.)).

¶ 40   The court also described the seriousness of defendant's offense, which involved repeatedly discharging a deadly weapon in public, stating that defendant was "shooting on the street at God knows who" with a firearm he "should never even have." See *People v. Vega*, 2018 IL App (1st) 160619, ¶ 68 ("The seriousness of the offense, and not mitigating evidence, is the most important sentencing factor."). The court was not required to lend greater weight to any factors defendant considers mitigating, and the presence of mitigating factors did not require a minimum sentence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 41   In his reply brief, defendant suggests that his lengthy criminal history should be seen as a mitigating factor, as it suggests that further imprisonment will not rehabilitate him. However, the trial court was not required to consider this factor as mitigating, and the trial court was statutorily authorized to consider defendant's prior criminal history as an aggravating factor. 730 ILCS 5/5-5-3.2(a)(3) (West 2018). In fact, the court noted that when defendant was in prison, defendant did "good things," and that defendant did not seem to want to "further [his] education" when out of prison. The court made a specific finding that more prison time would rehabilitate defendant, and

we must afford great deference to the trial court's discretion. *Stacey*, 193 Ill. 2d at 209. We find

the trial court did not abuse its discretion in imposing a 10-year sentence.

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 43    Affirmed.